UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| RAMON E. CANCEL MORALES; NORMA I. VALENTIN OLIVERAS; JOSE A. TIRADO-ORTIZ; LLOYD A. PABON RIVERA, SANTOS PEREZ SILVA and VICTOR SANTOS BURGOS; individually and on behalf of all other individuals similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT** |
| v. | **JURY TRIAL DEMANDED** |
| PFIZER INC.; PFIZER PHARMACEUTICALS, INC.; PFIZER PHARMACEUTICALS, LLC; PFIZER PHARMACEUTICALS, LTD.; PFIZER CORPORATION; ADMINISTRATIVE COMMITTEE OF THE PFIZER SAVINGS PLAN FOR EMPLOYEES RESIDENT IN PUERTO RICO; ADMINISTRATIVE COMMITTEE OF THE PFIZER SAVINGS AND INVESTMENT PLAN FOR EMPLOYEES RESIDENT IN PUERTO; SAVINGS PLAN COMMITTEE OF PFIZER, INC.; PLAN ADMINISTRATIVE COMMITTEE OF THE SEARLE PUERTO RICO SAVINGS PLAN; INVESTMENT COMMITTEE OF THE WARNER LAMBERT SAVINGS AND STOCK PLAN FOR COLLEAGUES IN PUERTO RICO; ROBERT N. BURT; TIM L. COWLEY; TERESA M. HOLLAND; WILLIAM R. HOWELL; STANLEY O. IKENBERRY; YVONNE R. JACKSON; SHARON A. KINSMAN; ALAN G. LEVIN; GEORGE A. LORCH; HENRY A. MCKINNELL; J.J. MILANO; SYLVIA MONTERO; RENE MORALES; ROBERT W. NORTON; RICHARD A. PASSOV; LOUIS PRADO; FRANKLIN D. RAINES; CARLOS H. DEL RIO; WILLIAM J. ROBISON; DAVID L. SHEDLARZ; M.P. TARNOK; BARRY H. WESTGATE; and JOHN DOES 1-20, | |
| Defendants. | |

Plaintiffs Ramon E. Cancel Morales, Norma I. Valentin Oliveras, Jose A. Tirado-Ortiz,

Lloyd A. Pabon Rivera, Santos Perez Silva, and Victor Santos Burgos (collectively "Plaintiffs"),

individually and on behalf of all others similarly situated, and on behalf of the retirement plans

sponsored by Pfizer Pharmaceuticals, LLC and/or Pfizer, Inc. and/or Pfizer Corporation (together, "Pfizer" or the "Company") in which they were participants, allege as follows:

## I.      INTRODUCTION

1.      Plaintiffs were participants in one or more of the following Pfizer-sponsored retirement plans for the Company's employees in Puerto Rico:  (a) the Pfizer Savings Plan for Employees Resident in Puerto Rico ("PSP Plan"); (b) the Warner-Lambert Savings and Stock Plan for Colleagues in Puerto Rico ("W-L Plan"); (c) the Pfizer Savings and Investment Plan for Employees Resident in Puerto Rico ("PSIP Plan"); (d) and the Pharmacia Savings Plan for Employees Resident in Puerto Rico ("Pharmacia Plan"); and (e) the Searle Puerto Rico Savings Plan 1165(e) ("Searle Plan") (together, the "Plans").

2.      Plaintiffs' allegations are based upon the investigation of Plaintiffs' counsel, which includes a review of Pfizer's filings with the U.S. Securities and Exchange Commission ("SEC"), including Pfizer's proxy statements (Forms 14A), annual reports (Forms 10-K), quarterly reports (Forms 10-Q), current periodic reports (Forms 8-K), registration statements (Forms S-8), and the annual reports (Forms 11-K) filed on behalf of the retirement plans sponsored by the Company, and subsequent amendments, a review of the Form 5500s filed by the Plans with the Department of Labor, interviews with participants of the Plans, and a review of available documents governing the operations of the Plans.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.      Plaintiffs bring this class action on behalf of the individual participants thereto and on behalf of the Plans against the Plans' fiduciaries pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002, *et seq.*  Plaintiffs allege that the Plans' fiduciaries breached their ERISA-imposed duties by (a) failing to diversify the Plans'

assets and allowing the Plans to become over-concentrated in equity investments, including investments in Pfizer stock; (b) failing to offer a sufficiently diversified choice of investment alternatives to the Plans' participants; and (c) breaching other fiduciary duties incumbent upon ERISA fiduciaries, including the duty to loyally and prudently administer the Plans, when the Defendants knew or should have known that Pfizer stock was an imprudent investment for the Plans.

4.     Plaintiffs allege that Defendants should have not allowed an over-concentration of Pfizer securities in participants' accounts and should have phased out the Plans' participants' holdings of Pfizer securities.  Defendants should also have ensured that the Plan's investment alternatives were diversified across the asset classes, industries and investment style available for managed funds.  Defendants' failure to ensure such diversification constitutes a breach of their fiduciary duties which has caused plan participants to suffer permanent losses to the value of their retirement accounts.

5.     Plaintiffs also allege that Defendants knew or should have known that Pfizer stock was an imprudent investment at all times during the Prudence Class Period (as defined herein at Section X)[1] because the Company was engaging in undisclosed risky and improper activities in relation to its prescription drugs, including Celebrex and Bextra, which artificially inflated the value of Company stock.  Specifically, Plaintiffs allege that Pfizer and Pharmacia, Pfizer's predecessor-in-interest, disputed, minimized, and concealed indications that Celebrex and Bextra posed unacceptable side effects and risks of injury, including heart attack and stroke.  As a result of the undisclosed risks caused by Celebrex and Bextra, and the lack of benefit these drugs offered over drugs already on the market, the value of Pfizer stock and the Plans' investments in

---

[1] Unless otherwise specified, "Class Period" refers collectively to the Prudence and Over-Concentration Class Periods defined herein at Section X.

Pfizer stock were artificially inflated, and became substantially diminished when the truth about these risks was disclosed.

6.      Plaintiffs allege in Count I that the Defendants responsible for investment of the assets of the Plans breached their fiduciary duties in violation of ERISA by failing to diversify the assets in the Plans and by failing to offer a diversified choice of investment alternatives to the Plans' participants.  In Count II, Plaintiffs allege that Defendants breached their fiduciary duties in violation of ERISA by failing to prudently and loyally manage the Plans by continuing to offer Pfizer stock when it was no longer a prudent investment for participants' retirement savings.  In Count III, Plaintiffs allege that Defendants breached their fiduciary duties by failing to disclose necessary information to co-fiduciaries, including non-public information.   In Count IV, Plaintiffs allege that Defendants responsible for the selection, removal, and, thus, monitoring of the Plans' fiduciaries, failed to properly monitor the performance of their fiduciary appointees and remove and replace those whose performance was inadequate.  In Count V, Plaintiffs allege that Defendants who communicated with Plan participants regarding the Plans' assets, or had a duty to do so, failed to provide them with complete and accurate information regarding Pfizer stock sufficient to advise participants of the true risks of investing their retirement savings in Pfizer stock.  In Count VI, Plaintiffs allege that the Defendants breached their fiduciary duty of loyalty by acting in furtherance of their personal interests as employees or executives of Pfizer at the expense of the Plans' and Plaintiffs' best interests. Finally, in Count VII, Plaintiffs allege that Defendants breached their duties as co-fiduciaries by failing to prevent their co-fiduciaries from breaching their duties of prudent and loyal management, complete and accurate communications, and adequate monitoring.

7.      Plaintiffs allege these claims individually and on behalf of the Classes defined herein at ¶¶ 13-14.  Plaintiffs also allege these claims on behalf of the Plans themselves.  ERISA

§§ 409(a) and 502(a)(2) authorize participants such as Plaintiffs to sue in a representative capacity on behalf of the plans for losses suffered by the Plans as a result of breaches of fiduciary duty. Pursuant to that authority, under ERISA § 409(a) and 502(a)(2), Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23 on behalf of all participants and beneficiaries of the Plans whose Plan accounts were invested in Pfizer stock during the Class Period and on behalf of the Plans.

8.      On behalf of themselves and the Classes and on behalf of the Plans, Plaintiffs seek to recover losses to the Plans (for which Defendants are personally liable) pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2).

9.      In addition, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs seek other equitable relief from Defendants, including, without limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, equitable tracing, and other monetary relief.

10.     **Subject Matter Jurisdiction**. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

11.     **Personal Jurisdiction**. ERISA provides for nationwide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). All of the Defendants are either residents of the United States or subject to service in the United States and the Court therefore has personal jurisdiction over them. The Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would all be subject to the jurisdiction of a court of general jurisdiction in Puerto Rico.

12.     **Venue**. Venue is proper in this district pursuant to ERISA § 402(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the Plans are administered in this district, some or all of the

fiduciary breaches for which relief is sought occurred in this district, and/or some Defendants reside and/or transact business in this district and all Plaintiffs reside in this district.

## II.     DEFINED TERMS

As used in this Complaint, the following terms are defined as follows:

13.     The "Over-Concentration Class" means all persons, other than Defendants, who were participants in, or beneficiaries of, any of the Plans which are the subject of this suit at any time between August 29, 2000 and the present and whose accounts held more than 30% of their assets in Pfizer securities or common stock funds.

14.     The "Prudence Class" means all persons, other than Defendants, who were (1) participants in, or beneficiaries of, the PSP Plan, the PSIP Plan, the W-L Plan or the Searle Plan at any time between August 29, 2000 and December 9, 2005, and whose accounts included investments in Pfizer stock, or (2) participants in, or beneficiaries of, the Pharmacia Plan at any time between August 29, 2000 and April 16, 2003, and whose accounts included investments in Pharmacia stock.

15.     "Company Stock Fund(s)" means an investment fund that invests primarily in Pfizer or Pharmacia common stock. Company Stock Funds include PSIP-PR Fund C, PSIP-PR Fund D, PSP-PR Company Stock Fund, PSP-PR Pfizer Match Fund, W-L PR Plan Company Stock Fund, Pharmacia Savings Plan Company Stock Fund for Employees Resident in Puerto Rico, Searle Puerto Rico Savings Plan 1165(e) Company Stock Fund.

16.     The "Pfizer Officer Defendants" means Defendants Yvonne R. Jackson, Henry A. McKinnell and David L. Shedlarz. The Pfizer Officer Defendants are the Pfizer executives who exercised decision making authority on behalf of The Plans and Pfizer, including approval of investment options of the Pfizer Plans. These Defendants were also members of the Leadership Team during the Class Period.

6

17.     "Pfizer Compensation Committee Director Defendants" means the Pfizer Compensation Committee of the Board of Directors and its members, including Defendants Robert N. Burt, Stanley O. Ikenberry, George A. Lorch, and Franklin D. Raines.

18.     "Pfizer Plan Committees" means collectively the administrative and investment committee(s) appointed to supervise and manage the Pfizer Plans. Records indicate that the Pfizer Plan Committees did business under various names during the Class Period, including the Savings Plan Committee, the Savings and Investment Plan Committee, the Investment Committee, the Global Benefits Investment Committee, and the Administrative Committee. Plaintiffs are informed and believe that all of these titles refer to the same functional body, which had certain responsibilities concerning the Pfizer Plans.

19.     "Pfizer Committees Defendants" means the Pfizer Plan Committees, as well as each member of the various Pfizer Plan Committees during the Class Period, specifically Tim L. Cowley, Teresa M. Holland, William R. Howell, Yvonne R. Jackson, Sharon A. Kinsman, Alan G. Levin, J.J. Milano, Sylvia Montero, Rene Morales, Robert W. Norton, Richard Passov, Louis Prado, Carlos H. del Rio, William J. Robison, David L. Shedlarz, M.P. Tarnok, Barry H. Westgate, and John Does 1-20.

### III.     THE PARTIES

**A.     Plaintiffs**

20.     **Plaintiff Ramon E. Cancel Morales.** During the Class Period, Mr. Cancel Morales was an employee of Searle/Monsanto Puerto Rico and a participant in one or more of the Plans.

21.     **Plaintiff Norma I. Valentin Oliveras.** During the Class Period, Ms. Valentin Oliveras was an employee of Pfizer, Searle and Searle Monsanto and a participant in one or more of the Plans.

22.    **Plaintiff Jose A. Tirado-Ortiz.**  During the Class Period, Mr. Tirado-Ortiz was an employee of Pfizer and a participant in one or more of the Plans, including the W-L Plan.

23.    **Plaintiff Lloyd A. Pabon Rivera**.  During the Class Period, Mr. Pabon Rivera was an employee of Warner-Lambert Puerto Rico and one of Pfizer's Puerto Rico subsidiaries and was a participant in one or more of the Plans, including the W-L Plan, the PSP Plan and/or the PSIP Plan.  At all relevant times, Pfizer stock was an investment in Rivera's plan account.

24.    **Plaintiff Santos Perez Silva**.  During the Class Period, Mr. Perez Silva was an employee of Pfizer and a participant in the PSP Plan.  Since 2004, Mr. Perez Silva has had 100% of his retirement account assets invested in Pfizer stock.

25.    **Plaintiff Victor Santos Burgos**.  During the Class Period, Mr. Santos Burgos was an employee of Pharmacia in Puerto Rico and was a participant in the Pharmacia Plan.

B.    **Defendants**

1.    **Pfizer Corporate Defendants**

26.    **Pfizer Pharmaceuticals, LLC** was at all relevant times a limited liability company operating in, and pursuant to the laws of, the Commonwealth of Puerto Rico.  During the Class Period, Pfizer Pharmaceuticals was the employer of participants of the PSP Plan and the PSIP Plan, and was the employer of the Plaintiffs and Class members.

27.    **Pfizer Corporation** is an indirect wholly owned subsidiary of Pfizer, Inc. and is the "employer" of participants in the PSP Plan and the PSIP Plan.

28.    **Pfizer, Inc.** is a Delaware corporation with its headquarters located at 235 East 42nd Street, New York, New York and is the parent company of Pfizer Corporation and Pfizer Pharmaceutical LLC.  Pfizer, Inc. was a sponsor of some of the Plans for some of the Class Period and is jointly liable for its own fiduciary breaches and the fiduciary breaches of it subsidiaries, employees, agents and directors.

8

29.     Pfizer is the successor-in-interest of the companies it acquired during the Class Period, including the Warner-Lambert Company, Pharmacia and Searle.  Thus Pfizer is liable for any breaches of fiduciary duty committed by Pharmacia, Warner-Lambert and/or Searle.

30.     **The Pfizer Officer And Director Defendants.**  During the Class Period, Defendants Yvonne R. Jackson, Henry A. McKinnell and David L. Shedlarz were individual members of the Pfizer "Leadership Team," and were also high-ranking corporate officers of Pfizer.

31.     The Leadership Team's compensation was tied directly to the performance of the Company.  Leadership Team members received millions of dollars in annual salary and bonuses and, in addition, received millions of dollars in common stock, stock options, and other compensation under the Company's executive compensation incentive award plans.

a.     **Defendant Yvonne R. Jackson.** During the Class Period, Ms. Jackson was Senior Vice President of Human Resources and was a member of the Pfizer Leadership Team from 2004 through 2005. As described below, Ms. Jackson was also a member of the Pfizer Plan Committee during that same time period.

b.     **Defendant Henry A. McKinnell.** During the Class Period, Dr. McKinnell was Chief Executive Officer and Chairman of the Pfizer Board of Directors since 2001 and also held the titles of President of the Company from 1999 through 2001, Chief Operating Officer in 2000, President of Pfizer Pharmaceuticals Group from January 1997 through April 2001, and Chief Operating Officer from May 1999 through December 2000. Dr. McKinnell was a member of the Corporate Management Committee in 2000, the Pfizer Leadership Team from 2001 through 2005, and has served on the Pfizer Executive Committee since 2005. In addition to his other duties, as a member of Pfizer's Corporate Management Committee and thereafter of Pfizer's Leadership Team, McKinnell evaluated and made strategic decisions for the Company.

McKinnell signed Company SEC filings during the Class Period, including Annual Reports on Form 10-K for the years ending December 31, 2000 through December 31, 2005.  In addition, Dr. McKinnell certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that each of Pfizer's Quarterly Reports (Form 10-Q) from the third quarter of 2002 through the first quarter of 2006, *inter alia,* (1) did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; and (2) the financial statements, and other financial information included in each quarterly report, fairly presented in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented. As discussed herein, a number of these SEC filings failed to provide complete and accurate material information regarding the Company's financial condition and the facts that rendered Company Stock and Company Stock Funds an imprudent retirement investment. During the Class Period, Dr. McKinnell sold on the open market or otherwise disposed of at least 809,000 shares of Pfizer common stock for proceeds and benefits of at least $29.7 million.

      c.     **Defendant David L. Shedlarz.** During the Class Period, Mr. Shedlarz was Vice Chairman of Pfizer, Inc. and also served as the Chief Financial Officer & Executive Vice President from 2000 through 2005. Mr. Shedlarz served as a member of the Corporate Management Committee in 2000, the Pfizer Leadership Team in 2001 through 2005, and has served on the Pfizer Executive Committee since 2005. In addition, as described below, Mr. Shedlarz served as a member of the Pfizer Plan Committee during the Class Period. Mr. Shedlarz signed Company SEC filings during the Class Period, including Annual Reports on Form 10-K for the years ending December 31, 1999 through December 31, 2004.  Mr. Shedlarz was also the Chairman of the Investment Committee of the W.L. Plan and in that capacity signed SEC filings

Form 11-Ks. In addition, Mr. Shedlarz certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that each of Pfizer's Quarterly Reports (Form 10-Q) from the third quarter of 2002 through the third quarter of 2004, *inter alia,* (1) did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; and (2) the financial statements, and other financial information included in each quarterly report, fairly presented in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented. As discussed herein, a number of these SEC filings, failed to provide complete and accurate material information regarding the Company's financial condition and the facts that rendered Company stock and Company Stock Funds an imprudent retirement investment. During the Class Period, Mr. Shedlarz sold on the open market or otherwise disposed of at least 311,000 shares of Pfizer common stock for proceeds and benefits of at least $9.5 million.

### 2.    Pfizer Compensation Committee Defendants

32.    The members of the Pfizer Board of Directors who were members of the Compensation Committee were also officers and key executives of Pfizer, including heads of the Science and Technology, Research, Manufacturing, and Human Resource Departments, among others. While its precise role is unclear, during the Class Period the Compensation Committee is believed to have exercised decision-making authority over key decisions with respect to the Pfizer Plans, including selection and/or approval and/or monitoring of investments.

33.    The Pfizer Director Compensation Committee Defendants had decision-making authority for Pfizer and each of its subsidiaries and Plans, including the power to appoint,

remove, and monitor other Plan fiduciaries. Upon information and belief, the Compensation Committee administers the Plans at issue herein.

34.     Each of the Pfizer Compensation Committee Defendants signed the Company's Annual Report filed with the SEC, Form 10-K, for the year(s) in which he or she served as a director of the Company.

35.     Each of the Pfizer Compensation Committee Defendants was privy to or had access to information at the highest level of the Company. Each of the Pfizer Compensation Committee Defendants knew or should have known the true state of affairs at Pfizer, the serious and substantial problems related to Pfizer's marketing of risky products (including Celebrex and Bextra), Pfizer's liability for injuries allegedly related to those products, Pfizer's liability for improper marketing practices, and Pfizer's improper accounting practices as alleged herein. Plaintiffs allege, as described more fully in Section VIII below, that the Pfizer Compensation Committee Defendants are *de facto* fiduciaries.

36.     Individual members of the Pfizer Board of Directors Compensation Committee during the Class Period are:

         a.     **Defendant Robert N. Burt.** Mr. Burt has been a member of the Pfizer Board of Directors and the Audit and Compensation Committees from June 2000 to the present. He has served as Chair of the Pfizer Audit Committee since 2001. Mr. Burt also served as a member of the Board of Directors of Warner-Lambert Company from 1995 to 2000 and as a member of its Investment Committee, as described below, during the Class Period.

         b.     **Defendant Stanley O. Ikenberry.** Dr. Ikenberry has been a member of the Pfizer Board of Directors from 1982 to the present, and, on information and belief, a member of the Pfizer Compensation Committee since 2005, Pfizer Corporate Governance Committee

from 1999 through 2004, the Pfizer Science and Technology Committee from 2003 to 2005, and the Pfizer Executive Committee since 1999.

   c.  **Defendant George A. Lorch.** Mr. Lorch has been a member of the Pfizer Board of Directors from June 2000 to the present, and member of the Pfizer Compensation Committee during the Class Period.

   d.  **Defendant Franklin D. Raines.** Mr. Raines was a member of the Pfizer Board of Directors from 1998 until April 28, 2005, and member of the Pfizer Compensation Committee and the Pfizer Science and Technology Committee during the Class Period.

   **3.**  **Pfizer Committee Defendants**

   37.  Each of the Plans named herein were sponsored by Pfizer Pharmaceuticals, LLC and were managed, in whole or in part, by the Pfizer Plan Committees as fiduciaries for the Plans, as described below:

   a.  The Pfizer Savings and Investment Plan for Employees Resident in Puerto (PSIP Plan) was managed by its Administrative Committee.

   b.  The Pfizer Savings Plan for Employees Resident in Puerto Rico (PSP Plan) was managed by its Administrative Committee.

   c.  The Pharmacia Savings Plan for Employees Resident in Puerto Rico (Pharmacia Plan) was managed by the Savings Plan Committee of Pfizer, Inc.

   d.  The Warner Lambert Savings and Stock Plan for Colleagues in Puerto Rico (W-L Plan) was managed by its Investment Committee.

   e.  The Searle Puerto Rico Savings Plan 1165(e) (Searle Plan) was managed by the Plan Administration Committee of Searle & Co.

   f.  The Global Investments Committee exercised oversight over all Plans and Plan Committees.

38.     While each of these Committees listed above was formally maintained by Pfizer Pharmaceuticals, LLC, the membership of these committees was virtually identical, so that in fact, a single group of individuals, defined here as the Pfizer Plan Committees, effectively managed all of the Plans during the Class Period.

39.     Each of the known Pfizer Committee Defendants was a high-level officer of the Company. As a direct consequence of their high-level positions, each of the Pfizer Committee Defendants knew or should have known the true state of affairs at Pfizer, the serious and substantial undisclosed problems related to Pfizer's marketing of risky products (including Celebrex and Bextra), Pfizer's liability for injuries allegedly related to those products, Pfizer's liability for improper marketing practices, and Pfizer's improper accounting practices as alleged herein.  Plaintiffs allege, as described more fully below, that the Committee Defendants are *de facto* fiduciaries with the duty to monitor, and the duty of prudence.

40.     In addition to the Pfizer Plan Committees, the Pfizer Committee Defendants are:

a.      **Defendant Tim L. Cowley.** On information and belief, Mr. Cowley was Senior Vice President of Human Resources for Pfizer during the Class Period. Mr. Cowley also served as a member of one or more of the Plans' administrative committees, and as the Plan Administrator for the W-L Plan during the Class Period.  Plaintiffs believe that Mr. Cowley has served in these capacities from June 2005 until the present. Mr. Cowley signed the 2003 Form 5500 for the W-L Plan on behalf of Pfizer.

b.      **Defendant William R. Howell.** Mr. Howell has been a member of the Pfizer Board of Directors from June 2000 to the present. He has served as a member of the Pfizer Audit Committee since 2001, as Chair of the Audit Committee since 2005, and as a member of the Warner-Lambert Company Board of Directors from 1983 to 2000.  Mr. Howell has also

served as a member of one or more of the Plans' administrative committees during the Class Period.

       **c.**    **Defendant Carlos H. del Rio.** Mr. del Rio served as Vice President of Pfizer Pharmaceuticals, LLC and served as a member of one or more of the Plans' administrative committees during the Class Period and, in this capacity, signed the Form 11-K for the PSP Plan filed with the SEC in 2003.

       **d.**    **Defendant Teresa M. Holland.** On information and belief, during the Class Period, Ms. Holland served as the Assistant General Counsel and Assistant Secretary for Pfizer. Ms. Holland also served as a member of one or more of the Plans' administrative committees, including the W-L Plan, during the Class Period.

       d.    **Defendant Yvonne R. Jackson.** On information and belief, Ms. Jackson served as Senior Vice President of Human Resources at Pfizer during the Class Period. Ms. Jackson also served as a member of the Pfizer Leadership Team from 2004 through 2005, and was a member of one or more of the Plans' administrative committees during the Class Period.

       e.    **Defendant Sharon A. Kinsman.** During the Class Period, Ms. Kinsman served as Assistant Treasurer of Pfizer and was a member of one or more of the Plans' administrative committees during the Class Period. Ms. Kinsman signed a number of relevant IRS filings, including the Form 5550s for the PSP Plan in 2003 and 2004, and for the W-L Plan for 2000 through 2002.

       f.    **Defendant Alan G. Levin.** On information and belief, during the Class Period Mr. Levin served as Vice President and Treasurer for Pfizer until 2000, Vice President of Finance for Pfizer from 2000 through 2003, Senior Vice President of Finance and Strategic Management for Pfizer Global Research and Development from 2003 through 2005, and Senior Vice President and Chief Financial Officer for Pfizer since March 2005. Mr. Levin also served as

a member of one or more of the Plans' administrative committees during the Class Period, including the W-L Plan from at least August 2000 until August 2003. During the Class Period, Mr. Levin signed Company SEC filings during the Class Period, including the Annual Report for Year 2005 (Form 10-K), filed March 1, 2006. In addition, Mr. Levin certified, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, that each of Pfizer's Quarterly Reports (Form 10-Q) from the first quarter of 2005 through the first quarter of 2006, *inter alia,* (1) did not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this quarterly report; and (2) the financial statements, and other financial information included in each quarterly report, fairly presented in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented.

g.     **Defendant J.J. Milano.** During the Class Period, Mr. Milano served as Secretary to Pfizer and also served as member and Secretary of one or more of the Plans' administrative committees, including the W-L Plan from at least August 2000 until August 2003. Although the Plan Documents specify that the Committee Secretary need not be a member of the Committee, it is believed, based upon the information available to date, that Mr. Milano served as a member of the Committee. It is further believed that Mr. Milano continued to serve in these capacities from June 2005 until the present.

h.     **Defendant Sylvia Montero.** On information and belief, during the Class Period, Ms. Montero served as Vice President—Human Resources for Pfizer's Animal Health Group until 2001, for which she assumed additional responsibilities for Public Affairs in 2003, and as Senior Vice President-Human Resources for Pfizer's Global Research and Development from 2003 through 2005. In March 2005, Ms. Montero was appointed Senior Vice President—

16

Human Resources for Pfizer. Ms. Montero also served a member of one or more of the Plans' administrative committees from June 2005 until the present.

i.      **Defendant Rene Morales.** During the Class Period, Mr. Morales served as Administrator for the Pfizer Plans in Puerto Rico, including the PSIP Plan, the W-L Plan, and the PSP Plan, and signed the 2001 and 2002 Form 5500s for the PSP Plan as Plan Administrator.

j.      **Defendant Robert W. Norton.** On information and belief, during the Class Period, Mr. Norton served as Senior Vice President-Corporate Human Resources of Pfizer. Mr. Norton also served as member of the Pfizer Leadership Team from 2001 through 2003, and as a member of one or more of the Plans' administrative committees during the Class Period, including the W-L Plan.

k.      **Defendant Richard A. Passov.** During the Class Period, Mr. Passov served as Vice President and Treasurer of Pfizer, and a member and Chairman of one or more of the Plans' administrative committees, including the W-L Plan. During the Class Period, Mr. Passov signed a number of relevant SEC filings on behalf of Pfizer and the Pfizer Plan Committee, including the 2004 Form 11-K for the PSP Plan.

l.      **Defendant Louis Prado.** During the Class Period, Mr. Prado served as General Manager of Pfizer Pharmaceuticals, LLC and member of one or more of the Plans' administrative committees.  Mr. Prado also served as Chair of the Savings and Investment Plan Committee and in this capacity signed the 2000 through 2002 Forms 11-K for the PSIP Plan. On information and belief, Mr. Prado also served as Chief Executive Officer (Plan Administrator) and General Manager of Pfizer Pharmaceuticals, Inc.

m.      **Defendant William J. Robison.** On information and belief, Mr. Robison served as Executive Vice President—Employee Resources for Pfizer Inc. during the Class Period. Mr. Robison also served as a member of one or more of the Plans' administrative

committees during the Class Period, including the W-L Plan. Mr. Robison retired from the Company on January 1, 2001. It is believed that he was a member of the Pfizer Plan Committee until his retirement.

n.    **Defendant David L. Shedlarz.** During the Class Period, Mr. Shedlarz was Executive Vice President and Chief Financial Officer of Pfizer from 2000 through March 2005. Since March 2005, he has served as Vice Chairman of Pfizer. He has been a member of the Pfizer Leadership Team and the Pfizer Executive Committee from 2001 through the present. Mr. Shedlarz served as member and Chair of one or more of the Plans' administrative committees during the Class Period, including the W-L Plan. On behalf of Pfizer and the Pfizer Plan Committees he chaired, Mr. Shedlarz signed a number of relevant SEC and IRS filings, including the 2000 through 2002 11-Ks for the W-L Plan.

o.    **Defendant M.P. Tarnok.** During the Class Period, Mr. Tarnok was Senior Vice President, Finance and also served as a member of one or more of the Plans' administrative committees. Plaintiffs believe that Mr. Tarnock continued to serve in these capacities from June 2005 until the present.

p.    **Defendant Barry H. Westgate.** During the Class Period, Mr. Westgate served as Vice President—Corporate Compensation, Benefits, and HR Information Technology, Corporate Human Resources for Pfizer Inc., and also served as a member of one or more of the Plans' administrative committees. Plaintiffs believe that Mr. Westgate continued to serve in these capacities from June 2005 until the present.

q.    **Defendant John Does 1-20** are persons who served on Pfizer Plan Committees during the Class Period but whose identities are not currently known to Plaintiffs. Once their true identities are ascertained, Plaintiffs will seek to join them as Defendants under their true names. While Plaintiffs have requested information identifying all fiduciaries,

information regarding the membership of these committees, or the extent to which they operated, this information has not been provided as part of the limited documents Defendants agreed to produce.

41.     With respect to fiduciary communications, a number of the Plans' Summary Plan Descriptions ("SPDs") incorporated by reference Pfizer's SEC filings, thus converting such materials into fiduciary communications.   A number of these SEC filings failed to provide complete and accurate material information regarding the Company's financial condition and the fact s that rendered Company Stock an imprudent retirement investment, as discussed herein.

## IV.     THE PLANS

### A.     Nature Of The Plans

42.     The Plans are subject to ERISA, but are not qualified under the IRS Code and accordingly, many of the immunities and exemptions under ERISA do not apply but the Plan fiduciaries are nonetheless subject to all of ERISA's fiduciary duties and provisions.   While the Plans are not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Plans under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

43.     The Plans are all subject to Puerto Rico General Revenue Code 1165(e).

44.     At all relevant times, the Plans had two separate components: (1) a participant contribution component; and (2) a matching component, which consisted entirely of employer contributions.

B.     **Pfizer Savings And Investment Plan
       For Employees Resident In Puerto Rico ("PSIP Plan")**

a.     **Nature And Purpose Of The Plan**

45.     The Pfizer Savings and Investment Plan for Employees Resident in Puerto Rico (the "PSIP Plan") was adopted on February 1, 1990 and is open to employees of the Puerto Rico branches of Pfizer Pharmaceuticals LLC, a subsidiary of Pfizer Inc. and Pfizer Corporation.

46.     One of the purposes of the PSIP Plan was to foster thrift and provide employees with additional security at retirement.  As an incentive, the Company provides that it will match a portion of such savings by regular contributions.

47.     The PSIP Plan did not purport to be an Employee Share Ownership Plan ("ESOP"). Nor did the PSIP Plan purport to invest primarily in Company Stock.

48.     The PSIP Plan likewise did not purport to be a § 404(c) Plan.

b.     **Investments In Company Stock**

49.     From the start of the Class Period until February 2002, participants were allowed to contribute between 2% and 15% of their regular earnings for investment in the PSIP Plan on a before tax basis or up to 10% on an after tax basis, subject to limits in the Tax Code.

50.     Contributions of up to 2% of compensation were matched 100% by Pfizer and the next 4% was matched 50% by Pfizer. As Employers, the Company had the option, at its discretion, to increase Employer contributions up to 100% of members' contributions.

51.     Participants directed the investment of their contributions among three investment options in the PSIP Plan. Two of these options were diversified stock and mutual funds, but they also included a Company Stock Fund, Fund C. The match was invested in a Company Stock Fund known as "Fund D."

52.     The PSIP Plan provided the Trustee or the Investment Advisor with full discretion to maintain any part of the assets of each Fund (including the Pfizer Common Stock Fund) in cash or short term securities if it deemed this necessary or desirable to accomplish the purposes of the Plan.

53.     Certain restrictions applied. Dividends paid to the PSIP Plan's Fund D were automatically reinvested in Fund D unless the participant otherwise instructed. Participants were not permitted to move investments in Fund D before age 55, and were limited to such transactions) once every three months. These provisions had the effect of discouraging PSIP Plan participants from reducing their holdings in Fund D and worked against the participants' interest.

### c.     Plan Control and Administration

54.     Pfizer Inc. was the PSIP Plan sponsor during the Class Period, and the PSIP Plan was administered by the Savings and Investment Plan Committee appointed and monitored by the Board of Directors. The Board of Directors, either directly or through the Committee, had the power to appoint Trustees and Investment Advisors for the Plan.

55.     The Banco Popular de Puerto Rico served as Trustee of the Plan. The PSIP Plan's trust agreement provided that any portion of the Funds may be invested in short-term investments, pending its permanent investment or distribution.

### C.     The Pfizer Savings Plan For Employees Resident In Puerto Rico ("PSP Plan")

### a.     Nature And Purpose Of The Plan

56.     On information and belief, the Pfizer Savings and Investment Plan for Employees Resident in Puerto Rico merged with the Warner-Lambert Savings and Stock Plan for Colleagues in Puerto Rico to become the Pfizer Savings Plan for Employees Resident in Puerto

Rico ("PSP Plan") on April 1, 2003.  This plan is open only to employees of the Puerto Rico subsidiaries of Pfizer, Inc. and Warner-Lambert for employees resident in Puerto Rico.

57.     One of the stated purposes of the PSP Plan was to foster thrift and provide employees with the opportunity for additional security at retirement. As an incentive, the Company provided that it will match a portion of such savings by regular contributions.

58.     The PSP Plan did not purport to be an ESOP. Nor did the PSP Plan purport to invest primarily in Company Stock.

59.     The PSP Plan purported to be a § 404(c) Plan. On information and belief, however, the PSP Plan was not § 404(c) compliant for reasons discussed herein.

**b.     Investments In Company Stock**

60.     Participants direct the investment of their voluntary contributions among six investment options in the PSP Plan. Most of these options are diversified mutual funds. However, among these options is a Company Stock Fund. The PSP Plan Company Stock Fund is invested primarily in Company Stock, subject to the additional discretion of the Plan Committee, as set forth below. Nowhere does it appear that the PSP Plan Company Stock Fund is precluded from investing in cash or other non-Company stock investments.

61.     Participants in the PSP Plan were permitted to defer a percentage of their base compensation for investment in the plan. From February 2002, at the PSP Plan's inception, until the present, participants were allowed to contribute up to 15% of their regular earnings (up to 10% after tax earnings or 10% before tax earnings up to a maximum of 15% of total earnings) for investment in the Plan, subject to limits in the Tax Code.

62.     Pfizer matched up to the first 3% invested by participants 100%. It matched the next 3% invested by participants 50%. Participant contributions in excess of 6% were not matched by Pfizer. In the PSP Plan, the employer matching contributions were

automatically invested in a Company Stock Fund known as the Pfizer Match Fund. The PSP Plan Pfizer Match Fund was invested primarily in Company Stock, subject to the additional discretion of the Plan Committee.  Nowhere did it appear that the PSP Plan Match Fund was precluded from investing in cash or other non-Company stock investments.

63.     Prior to January 1, 2005, dividends paid to the Company Stock Funds were automatically reinvested in the respective Funds.

64.     Pfizer encouraged Participants to invest in Company Stock and the Company Stock Funds. While the PSP Plan's SPD acknowledged the higher risk of investing in a single security than a diversified portfolio, the SPD touted Company Stock and Company Stock Funds as having a higher appreciation potential.  Pfizer's SEC filings, incorporated by reference into the PSP Plan SPD, touted the Company's performance and failed to disclose the facts that rendered Company Stock and Company Stock Funds an imprudent retirement investment.

### c.     Plan Control And Administration

65.     Upon information and belief, Pfizer Inc. was the Plan sponsor during the Class Period and acted through the Board of Directors and/or Leadership Committee.

66.     The Savings Plan Committee had fiduciary responsibility for the general operation of the Plan and authority to appoint and remove the Trustee, which was Northern Trust during the Class Period. The Committee was also responsible for carrying out the investment policies of the Plan, monitoring the investment funds and managers, and the other duties enumerated above.

D.      **Searle And Monsanto Puerto Rico Plans**

1.      **Searle Puerto Rico Savings Plan 1165(e) ("Searle Plan")**

67.     The Searle Puerto Rico Savings Plan 1165(e) ("Searle Plan") was established on January 1, 1987 for eligible employees in Puerto Rico.  According to the Plan, Searle is the "employer."

68.     The stated purpose of Searle Plan was to provide retirement benefits.  The money in the plan account contributed by participants was invested in the limited selection of non-diversified "professionally managed investment funds" at the selection of the participant.  The portion of the Plan Account assets which were "matching contributions" from the employer were invested directly and exclusively in shares of Pfizer common stock.

69.     The Searle Plan was not subject to many of the IRS regulations applicable to United States based 401(k)s including the obligation to pay federal income tax on any distributions while the participant is a Puerto Rico resident and the fiduciaries' immunity from liability for failing to diversify plan assets.

70.     The Searle Plan was established under Section 1165(e) of the Puerto Rico General Revenue Code.  The Searle Plan did not purport to be an ESOP or Eligible Individual Account Plan ("EIAP") under Internal Revenue Service guidelines.

71.     Participants may contribute from 2% to 10% of their compensation to the Plan up to $8,000.00 per year, pre-tax.  Participants may also make after tax contributions up to 10% of total compensation for all the years during which the participant has participated in the Plan, up to 16% of the participant's annual compensation for the year of the after tax contribution.

72.     The Searle Plan's sponsor is Searle & Co.

### 2.    Searle/Monsanto Puerto Rico Plan

73.    On information and belief, the Searle/Monsanto Puerto Rico Plan was renamed the Searle Puerto Rico Savings Plan 1165(e) after Pharmacia spun off Monsanto in 2002. For purposes of this Section, the Plan is referred to as the Searle/Monsanto Puerto Rico Savings Plan. On information and belief, Pharmacia acquired G.D. Searle & Company ("Searle") in April 2000, prior to being acquired by Pfizer. In April 2000, the Searle common stock held under the Searle Plan was automatically exchanged for Pharmacia common stock. As a result of the spin-off of Monsanto by Pharmacia in July 2002, participants in the Searle Plan who had a balance in the Pharmacia Common Stock Fund automatically received shares of Monsanto common stock. A Monsanto Common Stock Fund was established in August 2002, to be in existence for approximately one year. Later, when Pfizer acquired Pharmacia, balances in the Monsanto Common Stock Fund were automatically transferred to the Pfizer Common Stock Fund by August 29, 2003. Additionally, Pfizer common stock became an investment option for the Searle Plan on that day.

74.    Although Plaintiffs do not have enough information to confirm the Searle Plan features with respect to investment in Company stock or Searle Plan control and administration, Plaintiffs believe, based upon subsequent SPDs, that prior to its acquisition by Pfizer, Pharmacia, through its Board of Directors or its subsidiary Searle, set the investment policies for the Searle Plan or appointed those who did, and that the Retirement and Administrative Committees identified above acted as named fiduciaries and/or *de facto* fiduciaries with respect to the Searle Plan's investment decisions.  Plaintiffs will amend the specific allegations with respect to the Searle Plan as discovery permits.

E.      Warner-Lambert PR Plan ("W-L Plan")

75.     Pfizer Inc. acquired the Warner-Lambert Company ("Warner-Lambert") on June 19, 2000.  On that same day, the Warner-Lambert common stock held in the Warner-Lambert Savings and Stock Plan for Colleagues in Puerto Rico ("W-L Plan") were automatically exchanged for Pfizer common stock.  Additionally, the Pfizer Company Stock Fund became an investment option for the W-L Plan on that day.  On April 1, 2003, the W-L Plan merged into the PSP Plan.  Certain portions of the W-L Plan remained separate from the new "merged" Pfizer Savings Plan, subject to a collective bargaining agreement.

a.      Nature and Purpose of the Plan

76.     One of the stated purposes of the W-L Plan was to foster thrift and provide employees with the opportunity for additional security at retirement.  As an incentive, the Company provided that it will match a portion of such savings by regular contributions.

77.     The W-L Plan did not purport to be an ESOP.  Nor did the W-L Plan purport to invest primarily in Company Stock.

78.     Likewise, the W-L Plan did not purport to be a § 404(c) Plan, and at no time did the W-L Plan become § 404(c) compliant.

b.      Investments in Company Stock

79.     Throughout the Class Period, participants in the W-L Plan were permitted to defer a percentage of their base compensation for investment in the Plan.  Before the Warner-Lambert Company merged with Pfizer, participants were allowed to contribute between 1% and 15% of their base compensation, subject to limits in the Puerto Rico Tax Code, for investment in the Plan.

80.     Upon information and belief, this provision continued after the Warner-Lambert Company merged with Pfizer in 2000, until the W-L Plan was merged into the "harmonized" PSP Plan in 2002.

81.     In addition to numerous mutual funds, the W-L Plan offered two Company Stock Funds: one for employee contributions (called the "Employee Stock Fund") and one for employer contributions (called the "Company Stock Fund").

82.     Employer contributions were to be made in cash, provided, however, that the Company could, in the discretion of the Board of Directors, make or authorize such contributions in whole or in part shares of Company Stock in the form of Treasury Shares.

83.     Although the W-L PR Employee Stock Fund and the Company Stock Fund invested in the common stock of the Company, amounts temporarily held pending investment and amounts held for disbursement were permitted to be invested elsewhere.

84.     Although employees were permitted to transfer employee-contributed funds out of the Company Stock Funds, employees were prohibited from transferring employer-contributed contributions from the Company Stock Funds until age 55.

85.     Upon information and belief, participants were encouraged to invest in the W-L PR Employee Stock Funds. While the Plan's SPD acknowledged the higher risk of investing in a single security than a diversified portfolio, the SPD touted Company stock and the Company Stock Funds as having a higher appreciation potential. In addition, Pfizer's SEC filings, incorporated by reference into the W-L SPD, touted the Company's performance and failed to disclose the facts that rendered Company stock and Company Stock Funds an imprudent retirement investment.

86.     Warner-Lambert Company also matched 25% of pre-tax dollars or 35% of post-tax dollars of the first 6% of the contributions invested by participants in the W-L Plan, and made an additional contribution of 25% to 65% for participants with at least three years of membership in the Plan, based upon their prior year's contribution and the annual reported earnings per share growth.

### c.       Plan Control and Administration
#### i.       Board of Directors

87.       Under the W-L Plan, the Board of Directors had the sole responsibility for appointing and removing members of the Warner-Lambert Retirement and Savings Plan Committee ("Retirement Committee").  The Board of Directors also had the authority to elect the Chairman and the Secretary of the Warner-Lambert Retirement Committee, and to establish general investment policy guidelines for the Plan.

88.       On information and belief, after Warner-Lambert merged with Pfizer, the respective Pfizer Board of Directors (listed herein as the Pfizer Director Defendants) assumed the duties and responsibilities that the Warner-Lambert Board of Directors had held previously under the Warner-Lambert Plans.

#### i.       Retirement Committee

89.       Under the W-L Plan, the Retirement Committee consisted of at least three persons who were appointed by the Board of Directors. If the Board of Directors did not act, the Retirement Committee had the authority to elect a Chairman and Secretary of the Committee.

90.       The Retirement Committee had responsibility for (a) selecting and monitoring trustees and investment managers, (b) reviewing and monitoring investment activity in connection with the Plan and (c) establishing general investment policy guidelines for the Plan.

91.       The Retirement Committee had responsibility to appoint members of the Investment Committee, and to elect the Chairman of the Investment Committee.

92.       On information and belief, after Warner-Lambert merged with Pfizer, the work of the Retirement Committee was performed by the Pfizer Plan Committee, chaired by CFO David Shedlarz.

### ii.      Investment Committee

93.      The Investment Committee was designated the "named fiduciary" of the W-L Plan, with responsibility to administer the Plan, interpret the Plan, designate investment policies for the Plan, appoint or remove the Trustee or investment managers, and to add or delete investment funds available under the Plan. "Investment Funds" was defined to include the Employee Stock Fund and the Company Stock Fund.

94.      The Investment Committee consisted of at least three people. If the Retirement Committee did not act to elect a Chairman of the Investment Committee, the Investment Committee had that authority to elect a Chairman. In addition it had the power to elect a Secretary of the Committee.

95.      The W-L Plan also provided that the Retirement Committee and the Investment Committee could allocate its responsibilities among its members and delegate its duties to other persons outside of the Committee.

### F.      The Pharmacia Savings Plan<br>for Employees Resident Puerto Rico ("Pharmacia Plan")

#### a      Nature and Purpose of the Plan

96.      On information and belief, on April 16, 2003, Pfizer acquired Pharmacia. On April 16, 2003, the Pharmacia company stock held under the Pharmacia Plan was automatically exchanged for Pfizer stock. Additionally, Company Stock Funds holding Pfizer stock became an investment option for the Pharmacia Plan on that day. The Pharmacia Plan continued in its same form after Pfizer acquired Pharmacia.

97.      One of the stated purposes of the Pharmacia Plan was to provide employees with the opportunity for additional security at retirement.

98.     The Pharmacia Plan did not purport to be an ESOP, but claimed to have an ESOP component.  However, the Pharmacia Plan was not intended to invest primarily in Company stock and also failed to comply with the multiple statutory and regulatory requirements necessary to qualify as a true ESOP.

99.     From the time that Pharmacia common stock was exchanged for Pfizer common stock, the Pharmacia Plan purported to be a § 404(c) Plan. However for the reasons set forth herein, the Pharmacia Plan was not 404(c) compliant.

### b.     Investments in Company Stock

100.    Participants could elect to make before-tax or after-tax contributions to their 401(k) accounts of up to 20% of their eligible pay, up to a maximum of 100% of their total annual compensation.

101.    Participants were permitted to direct their contributions to seven "Core Investment Funds," one of four "Pre-mixed Funds" (which held pre-determined percentages of certain Core Investment Funds), a self-directed brokerage account, or a Company Stock Fund also known as the "Pfizer Common Stock Fund," or the "Common Stock Investment Account," which invested primarily in Company Stock and  short-term investment fund to provide the liquidity needed to process participant transactions.

102.    Employer contributions to the Pharmacia Plan were deposited in another Company Stock Fund known as the Company Matching Account. Contributions to the Company Matching Account were generally invested in Company Stock and could not be moved or reinvested until after the participant reached age 50. The minimum age requirement was lowered in January 2006 to permit participants between age 40 and 55 to diversify between 25% and 75% of their Company Matching accounts, depending upon their age. After January 1, 2006 employees

younger than 50 were not permitted to diversify their entire account until they reached age 55 or older.

103.    Any dividends paid to the stock fund were automatically reinvested in stock unless the participant elected to receive a cash distribution of the dividend.

104.    Pfizer moved the administration of the Pharmacia Plan from Harris Direct and Hewitt Associates to Fidelity as of November 1, 2005. During this transition a blackout period was imposed, starting October 20, 2005 for the Self-directed Brokerage accounts and on October 26th for all other accounts, through November 1, 2005, during which transactions could not be conducted on any Pharmacia Savings Plan accounts. Before this transition, Hewitt Associates provided an automatic rebalancing feature, which permitted Pharmacia Savings Plan participants to request that their account portfolios be automatically adjusted each quarter according to pre-set diversification allocations set by the Participant based upon the percentage of total value held in each designated fund. As a result of the change in administration, the automatic rebalancing option was eliminated. Participants who wished to rebalance their accounts were obliged to do so through manual account transfers after the transition.

### c.    Plan Control and Administration

105.    After the merger, the Pharmacia Plan was sponsored by Pfizer Inc. Upon information and belief, after Pharmacia was acquired by Pfizer in 2003 the Pharmacia Plan continued to operate according to the terms of the Plan regarding Pharmacia Plan control and administration that are relevant to this Complaint remained constant throughout the Class Period, unless otherwise noted.

106.    Under the Pharmacia Plan, Pfizer, though its Board of Directors, was responsible for selecting the Core Investment Funds, and for establishing and communicating to the Trustee a funding policy and method consistent with the objectives of the

Plan and of the Trust Fund. The Board was also responsible for appointing or removing the Global Employee Benefits Oversight Committee, a committee of its directors which had the authority and responsibility to appoint and monitor the Administrative Committee and Investment Committee, both of which were identified as named fiduciaries of the Pharmacia Savings Plan. To the extent the Board failed to appoint a Global Employee Benefits Oversight Committee, that Committee's authority and responsibilities remained with the Board.

107.    Under the Pharmacia Plan, Pfizer was also responsible for monitoring § 404(c) compliance, except that the Trustee monitored confidentiality compliance.

108.    Under the terms of the Pharmacia Plan, the Global Benefits Investment Committee served as the Investment Committee, unless the Global Employee Benefits Oversight Committee appointed another committee so to serve. The Global Employee Benefits Oversight Committee also was responsible for proposals related to the modifications of the Plan which result in significant increases in the Company's contributions to the Plan and annual review of global investment performance.

109.    Upon information and belief, while the Pharmacia Plan was operated by Pfizer, the Pfizer Plan Committee operated as the Administrative Committee and the Global Benefits Investment Committee. Thus, as the Global Benefits Investment Committee, the Pfizer Plan Committee had responsibility for all matters related to the control and management of Plan assets.  These responsibilities included: (1) establishment of funding and expense policies, methods and strategies for the Plan; (2) annual review and evaluation of the Plan's funding status; (3) establishment of investment policies relating to the Plan; (4) appointment, approval, and termination of the trustees, custodians, investment managers, investment consultants, actuaries, legal counsel, and other outside experts involved with the Plan; (5) arranging for and review of the annual financial audit of the Plan; (6) review, at least annually, of expenses of trustees, actuaries, investment managers, investment

32

consultants, and any internal administrative costs being charged to the Plan; and (7) preparation of an annual report to the Global Employee Benefits Oversight Committee.

110.     The Pfizer Plan Committee, acting as the Global Benefits Investment Committee, was charged with designating available Investment Funds available in the Pharmacia Plan, including the Common Stock Investment Account, and could designate additional Investment Funds or modify, cease to offer or eliminate any existing Investment Funds.

111.     The Pfizer Plan Committee, acting as the Administrative Committee, was also a named fiduciary and administrator of the Pharmacia Plan, and was charged with interpreting and applying the Plan and was responsible with the Plan's compliance with ERISA's reporting and disclosure requirements.

112.     According to the 2002 11-K filed for the Pharmacia PR Savings Plan, Northern Trust became Trustee of the Pharmacia Savings Plan on March 2, 2002.

G.     **The Plans' Fiduciaries**

1.     **The Nature of Fiduciary Status**

113.     ***Named Fiduciaries***.  ERISA requires every plan to provide for one or more named fiduciaries of the plan pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A).  The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator.  ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

114.     ***De Facto Fiduciaries***.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who, in fact, perform fiduciary functions.  Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets, (ii) he renders

investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

115.     Each of the Defendants was a fiduciary with respect to one or more of the Plans and owed fiduciary duties to those Plans and the Plans' participants under ERISA in the manner and to the extent set forth in the Plan Documents, through their conduct, and under ERISA.

116.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, as well as the Plans' investments, solely in the interest of the Plans' participants and beneficiaries.  As fiduciaries, Defendants were required to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

117.     ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still act solely in the interest of participants and beneficiaries, not in the interest of the sponsor.  Moreover, all fiduciaries of the Plan were obliged, when wearing their fiduciary hat(s), to act independently of Pfizer.  Pfizer had no authority under the governing Plan documents to direct the conduct of any of the fiduciaries with respect to the Plans, investments therein, or the disclosure of information between and among fiduciaries or from fiduciaries to the participants.

### 2.    Pfizer Director And Officer Defendants

118.    The Pfizer Director Defendants had the ultimate authority for the affairs of Pfizer, not only as the acting authority for Pfizer, but also through the discretionary authority they exercised and were specifically granted under the Pfizer Plans. In particular, the Pfizer Director Defendants exercised Pfizer's authority to appoint, remove, and monitor the Pfizer Committee Defendants, the plan administrators, and the plan trustees. Under Delaware law and Pfizer's Corporate Governance Principles, the Board of Directors "is the ultimate decision-making body of the Company except with respect to those matters reserved to the shareholders. It selects the senior management team, which is charged with the conduct of the Company's business. Having selected the senior management team, the Board acts as an advisor and counselor to senior management and ultimately *monitors* its performance." Pfizer, Inc. Proxy Statement (Schedule 14A) (Mar. 16, 2006), at 6.

119.    The Pfizer Director Defendants, at all applicable times, exercised control over the activities of Pfizer's officers and employees that performed fiduciary functions with respect to the Pfizer Plans, including the Pfizer Committee Defendants, and could hire, terminate, and replace these Committee members at will. The Pfizer Director Defendants could appoint or remove any member of the Pfizer Plan Committee at any time, with or without cause, and fill the resulting vacancy.

### 3.    Pfizer Compensation Committee
### And Fiduciary Committees Defendants

120.    The Pfizer Plan Committee is a named fiduciary for each of the Pfizer Plans, thereby automatically making the Pfizer Committee Defendants fiduciaries of the Pfizer Plans pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).  In addition, the Pfizer Committee Defendants are *de facto* fiduciaries because they exercised discretionary authority and control

respecting the administration and management of the Pfizer Plans and the disposition of their assets. The Pfizer Committee Defendants had the power to establish investment guidelines with respect to the assets of the Pfizer Plans.

121.    The Pfizer Committee Defendants had all powers necessary to administer the Pfizer Plans. All actions of Pfizer Committee Defendants concerning the construction, interpretation, and application of the Pfizer Plans were final, conclusive and binding.

122.    The Pfizer Committee Defendants had the power to appoint or employ advisors to render advice concerning the Pfizer Plans.

123.    Plaintiffs believe and allege that the Pfizer Committee Defendants had the authority to select the investment Funds offered by each of the Pfizer Plans.

124.    The Pfizer Committee Defendants had the power to designate in writing the accounts or funds into which the Plans' trustee, Northern Trust, was authorized to invest assets of the Plans. The Pfizer Committee Defendants had the power to terminate existing investment funds and establish new funds with advance written notice to the Trustee and to direct the Trustee with respect to allocation of contributions, transfers, and withdrawals and distributions among funds.

125.    From at least the beginning of the Class Period, Pfizer stock had become an unsuitable and imprudent investment offering for a retirement plan. Nonetheless, the Pfizer Committee Defendants and the other Pfizer Defendants imprudently permitted the Pfizer Plans to hold and acquire hundreds of millions of dollars in Company Stock. They did so despite the fact that the Pfizer Committee Defendants knew or should have known that there were undisclosed risks associated with its prescription drugs, including Celebrex and Bextra, which artificially inflated the value of Company Stock and the Company Stock Funds and which otherwise

rendered Company Stock and the Company Stock Funds an imprudent and inappropriate investment for participants' retirement savings.

126.    The Pfizer Committee Defendants failed to conduct a proper investigation concerning the nature and extent of the risk to the Pfizer Plans presented by Pfizer's marketing of risky products (including Celebrex and Bextra), its liability for injuries allegedly related to those products, its liability for improper marketing practices, and its improper accounting practices as alleged herein, which investigation would have been necessary and proper to protect the Pfizer Plans and their participants and beneficiaries against inevitable losses. An adequate investigation would have revealed to a reasonable fiduciary that investment in Pfizer stock, under these circumstances, was improvident.

127.    During the Class Period, the Plans were heavily loaded with Company Stock. One hundred percent of Pfizer's matching contributions were made in the form of Pfizer common stock and Pfizer common stock amounted to 77.2% of PSP Plan assets at year-end 2003, and 66.6% of PSP Plan assets at year-end 2004; 83.3% of W-L Plan assets at year-end 2002; 91.6% of PSIP Plan assets at year-end 2000, 88.5% of PSIP Plan assets at year-end 2001, and 82.2% of PSIP Plan assets at year-end 2002.  This investment strategy proved to be disastrous. When information emerged publicly in 2004 concerning safety concerns associated with Pfizer's blockbuster drugs Bextra and Celebrex, Pfizer stock fell by approximately 24%, causing hundreds of millions of dollars in losses to the Plans.

## V.    FIDUCIARY BREACH BACKGROUND PERTINENT TO THE PRUDENCE CLASS CLAIMS

### A.    Selective COX-2 Inhibitor Drugs

128.    Cyclooxygenase ("COX") is an enzyme that is responsible for formation of important biological mediators called prostanoids (including prostaglandins). Pharmacological

inhibition of COX can provide relief from the symptoms of inflammation and pain; this is the method of action of drugs such as aspirin and ibuprofen. Currently three COX isoenzymes are known: COX-1, COX-2 and COX-3.

129.    Two prostaglandins balance blood thickening and blood thinning forces in the body. Prostaglandin I2 (PGI2) dilates blood vessels, inhibits platelet aggregation, and prevents the proliferation of vascular smooth-muscle cells in vitro, a series of effects that decreases the clotting (thrombosis). PGI2 is largely a product of COX-2 which is induced in the lining of blood vessels. Thromboxane A2 (TxA2) is formed by COX-1. It is present in platelets and enhances platelet aggregation, vasoconstriction (shrinking of blood vessels), and proliferation of vascular muscle cells in response to injury, thereby increasing the likelihood of thrombosis.

130.    Non-steroidal anti-inflammatory drugs ("NSAIDs") are widely used pain relievers that treat arthritis, muscle pain, and inflammation. These include naproxen, ibuprofen, and diclofenac. Some NSAIDs cause serious gastrointestinal (also referred to as "GI") side effects, including perforations of the gastrointestinal lining of the gut, ulcers, and gastrointestinal bleeding.

131.    Non-selective NSAIDs inhibit COX enzymes, maintaining the clotting equilibrium. Aspirin, for example, is known to have an anti-thrombotic effect. It largely inactivates the platelet COX-1, thereby reducing the levels of TxA2 and decreasing blood clotting. Conversely, selective inhibition of COX-2 prevents the synthesis of PGI2, leaving the pro-thrombotic thromboxane unopposed.

132.    Selective COX-2 inhibitors such as Celebrex and Bextra were created to try to block the inflammatory signals generated by the COX-2 enzyme without causing the adverse effects resulting from COX-1 inhibition -- specifically, ulcers, gastrointestinal bleeding or perforation.

133.     From the outset Celebrex (and later Bextra) were designed to do *less* than aspirin, to be more selective and target fewer control switches inside the body. In doing so, Celebrex and Bextra had lost one positive benefit of aspirin - the cardio-protective effect achieved through inhibiting blood clots. When the pre-FDA approval studies were being conducted, Pfizer officials knew the worst case scenario would be if Celebrex had a negative cardiovascular effect. When the 1999 Study showed this to be the case, the Defendants decided to keep that information quiet.

### 1.     The Development And Launch Of Celebrex

134.     On or about July 13, 1995, G.D. Searle & Co. ("Searle"), a wholly owned subsidiary of Monsanto Company, filed its first investigational new drug ("IND") application with the U.S. Food and Drug Administration ("FDA") to conduct clinical trials of Celebrex (celecoxib) in humans. In December 1999, Monsanto and Searle merged with Pharmacia and Upjohn, Inc. to create Pharmacia Corporation. In 2003, Pharmacia merged with Pfizer Inc.

135.     From the outset, Pfizer worked with Searle and Searle's successor – Pharmacia – to market Celebrex.  Pfizer and Seale agreed to co-market Celebrex even before the drug was launched in 1998.

136.     On or about June 19, 1998, Searle submitted a New Drug Application ("NDA") for Celebrex to the FDA for the management of pain, rheumatoid arthritis, and osteoarthritis in oral capsule dosage forms of 100 and 200 mg.  The FDS granted celecoxib priority review.

137.     The FDA approved Celebrex for market on or about December 2, 1998. However, the indications for use were limited to the treatment of osteoarthritis and rheumatoid arthritis; Celebrex could not be marketed as a treatment for acute or general pain.  In addition, Celebrex had to carry a warning (like other NSAIDs) that it could cause gastrointestinal problems, such as ulcers.  In January 1999, Celebrex was launched.

138.    On April 30, 1999, the FDA approved Merck's Vioxx (rofecoxib) for marketing in the United States.  Vioxx came to market with several commercial advantages over Celebrex. It had broader indications of use, beyond arthritis pain, including acute short-term pain, menstrual cramps, and pain following dental or orthopedic surgery.  Also, Vioxx was to be dosed only once a day, while Celebrex often required twice-a-day dosing.

139.    On December 27, 1999, the FDA approved Celebrex for the indicated use of treating precancerous colon polyps in patients with a disease called familial adenomatous polyposis (FAP).

140.    On or about December 18, 2000, an efficacy supplement for a new indication – the management of acute pain in adults and the treatment of primary dysmenorrhea – was submitted to the FDA, which the agency approved on or about October 18, 2001.

### 2.    The Development And Launch Of Bextra

141.    On January 16, 2001, Pharmacia submitted the NDA for Bextra (valdecoxib). From the outset, Pfizer worked with Pharmacia to market Bextra, just as the two companies co-marketed Celebrex. Pfizer and Pharmacia launched Bextra on April 10, 2002.

142.    The marketing strategy for Bextra focused on convenience: Bextra, like Vioxx and unlike Celebrex, need only be taken once a day. Pharmacia and Pfizer also hoped to promote Bextra as the preferred COX-2 drug for severe pain, but the FDA did not approve Bextra for that use.

143.    On November 18, 2002, the FDA required Pfizer to amend the Bextra label after twenty reports of serious skin reactions surfaced among users. The reactions included the potentially fatal skin disease known as Stevens-Johnson Syndrome.

B.    **Pfizer And Pharmacia Promoted**
      **Celebrex And Bextra As Blockbuster Drugs**

144.    Both Celebrex and Bextra became major products and major profit centers for Pfizer, which jointly marketed Celebrex and Bextra along with Pharmacia. Celebrex, the first COX-2 inhibitor to reach the market, was the most successful drug launch in history. Celebrex quickly became one of Pfizer's biggest-selling drugs.

145.    Pfizer's financial success and future prospects depended on Celebrex and Bextra becoming "blockbuster" drugs. Within the five years after Celebrex and Bextra's expected arrival on the market in 1999-2002, Pfizer faced patent expiration dates for several of its best-selling drugs and the resulting loss of at least $4.7 billion in annual revenues to generic competition. For example, the patent for Ambien, Pharmacia's blockbuster sleep medication that accounted for $523 million in sales in 1999, $705 million in 2000, and $902 million in 2001, was set to expire in 2006, and Pharmacia was to lose marketing rights to the product in April 2002. Profitable Pfizer drugs scheduled to lose patent protection during or shortly after the Class Period included Zithromax, an antibiotic that accounted for over $1.3 billion in sales in 1999, $1.3 billion in 2000, and $1.5 billion in 2001, the patent for which would expire in 2005, and Zoloft, which accounted for over $1.9 billion in sales in 1999 $2.1 billion in 2000, and $2.3 billion in 2001, the patent for which will expire in 2006. In comparison, the patent for Celebrex will not expire until 2013. The patent for Bextra will not expire until 2015.

146.    Pfizer needed Celebrex and Bextra to make up for soon-to-be-lost sales from these blockbuster drugs. As a result, Pfizer aggressively pursued a merger with Pharmacia to secure continued revenues and earnings past 2010. Dr. Tadeusz J. Szuba's article entitled "Merger Mania" published in the *Journal of the Chamber of Parmacists* explained that, in

order for Pfizer to sustain its revenues and earnings following the expiration of certain patents, it was critical for Pfizer "to go forward with [the] merger with Pharmacia."

147.    Largely due to the success of Celebrex, Pfizer bought Pharmacia (including its rights to Bextra) outright on April 16, 2003. After the acquisition, Pfizer marketed Celebrex heavily, which led to Celebrex becoming the most prescribed drug for the treatment of arthritis. Celebrex accounted for approximately 6% of Pfizer's total income.

148.    In 2003, Pfizer tallied approximately $2.6 billion in sales of Celebrex. The number of prescriptions written totaled 23.6 million. The cost of promotions aimed at doctors was $483.6 million. The cost of direct consumer advertising was $87 million.

149.    Together, Celebrex and Bextra accounted for approximately 7.8% of Pfizer's revenue in 2004, totaling over $4.5 billion.

150.    Sales of Bextra totaled $935 million. The number of prescriptions written totaled 10.4 million. The cost of promotions aimed at doctors was $395.6 million.

151.    Worldwide sales of Celebrex and Bextra were expected to total more than $4 billion by 2004, comprising almost 10% of Pfizer's revenue.

152.    Throughout the Class Period, Pfizer repeatedly touted the safety of its COX-2 inhibitors, Celebrex and Bextra through SEC filings which were made available to Plan participants. For instance, Pharmacia's 8-K filing on November 1, 2000 referred to a study in the Journal of American Medicine and claimed that the study demonstrated with regard to Celebrex that there was "no increase in ... cardiovascular related events." Pharmacia Corporation, Current Report (Form 8-K) (Nov. 1, 2000). At page 21 of Pfizer's 2001 Annual Report to Shareholders, Pfizer asserted that "Celebrex has shown no increased cardiovascular risk compared with traditional arthritis medicines, which distinguishes it from Merck's selective COX-2 inhibitor Vioxx."

153.    Pfizer's second quarter 2002 Form 10-Q stated that "Celebrex is the COX-2 specific inhibitor approved to treat the broadest range of conditions. In June 2002, the FDA approved revised labeling for Celebrex. The new prescribing information includes additional gastrointestinal safety data and data indicating that there was no increased risk for serious cardiovascular adverse events observed." Pfizer Inc., Quarterly Report (Form 10-Q) (Aug. 13, 2002), p. 27. Pfizer's third quarter 2002 Form 10-Q reported that the FDA approved revised labeling for Celebrex includes "data indicating that there was no increased risk for serious cardiovascular adverse events observed, including heart attack, stroke and unstable angina." Pfizer Inc., Quarterly Report (Form 10-Q) (Nov. 13, 2002), p. 28.

154.    Likewise, Pfizer's January 22, 2003 8-K filing claimed that the "cardiovascular safety of Bextra" would "enhance sales of existing products and strengthen the future product portfolio." Pfizer Inc., Current Report (Form 8-K) (Jan. 22, 2003). On July 25, 2003, Pfizer filed a Form 8-K in which it claimed that it was "continuing to demonstrate Celebrex's safety advantages" and that there was "no evidence of increased cardiovascular risk." Pfizer Inc., Current Report (Form 8-K) (Jul. 25, 2003).

155.    Pfizer's first quarter 2004 Form 10-Q reported that Celebrex "provides strong efficacy, excellent tolerability, and a proven safety profile in providing relief for the pain and inflammation of osteoarthritis, rheumatoid arthritis, acute pain, and primary dysmenorrhea." Pfizer Inc., Quarterly Report (Form 10-Q) (May 7, 2004), p. 23. Pfizer's July 21, 2004 Form 8K asserted that the May 29, 2004 issue of The Lancet "provided further evidence of the cardiovascular safety of Celebrex." Pfizer Inc., Current Report (Form 8-K) (Jul. 21, 2004). Pfizer's second quarter 2004 10-Q touted that Celebrex "provides strong efficacy, excellent tolerability, and a proven safety profile in providing relief for the pain and inflammation of osteoarthritis, rheumatoid arthritis, acute pain, and primary dysmelorrhea. In May 2004,

European regulators completed a safety review and reaffirmed the use of COX-2- specific inhibitors such as Celebrex in a broad range of patients." Pfizer Inc., Quarterly Report (Form 10-Q) (Aug. 6, 2004), p. 26. On November 5, 2004, Pfizer filed its third quarter 2004 10Q, in which it reassured investors, including the Pfizer Plans' participants and beneficiaries, that "We have reaffirmed our confidence in the well-documented cardiovascular safety of Celebrex, and we have released information citing that there is no evidence of a cardiovascular safety signal for Celebrex in ongoing, long-term clinical trials involving more than 6,000 patients. . . . Available clinical information for Bextra, based on a recent pooled analysis of nearly 8,000 patients treated with Bextra for periods ranging from six weeks to one year, suggests no increased risk of cardiovascular thromboembolic events in patients with OA and RA. Pfizer will be conducting further studies to confirm the long-term cardiovascular safety profile of Bextra in patients who require chronic treatment for arthritis with a COX-2-s$_e$ecific inhibitor. . . . In studies in general surgery Bextra (valdecoxib) in combination with the investigational drug parecoxib (an intravenous formulation of valdecoxib) showed no increased risk of cardiovascular thromboembolic events" Pfizer Inc., Quarterly Report (Form 10-Q) (Nov. 5, 2004), pp. 28-29.

156. After publication of Topol, et al.'s August 2001 article in *JAMA*, Steve Geis of Pharmacia denied any cardiovascular risks with Celebrex. He stated, "We have never seen in any of our databases that Celebrex has a higher rate of cardiovascular events." T. Burton and G. Harris, "Study Raises Specter of Cardiac Risk For Users of Popular Arthritis Drugs," *The Wall Street Journal,* August 22, 2001 at Al.

157. On July 16, 2002, Pfizer CEO and Defendant Hank McKinnell was asked about the FDA's rejection of new labeling supporting a GI benefit with Celebrex over NSAIDs. When asked how Pfizer would compete with Vioxx, which had labeling recognizing a GI risk reduction, McKinnell stated, "We have to communicate that cardiovascular safety is a critical

differentiation between Celebrex and Vioxx."  R. Winslow and S. Hensley, "The Drug Behind the Deal: Pfizer-Pharmacia Deal Means You'll Hear More of Celebrex, But Aspirin May be Better." *The Wall Street Journal,* Jul. 16, 2002 at Dl.

158.    On September 30, 2004, Merck announced that it was beginning a worldwide withdrawal of its COX-2 inhibitor, Vioxx, after safety issues emerged regarding increased risk of heart attack and stroke. Merck saw its shares plunge as investors abandoned the company in droves. Estimates of Merck's liability regarding Vioxx and its safety have been estimated at approximately $18 billion. Amy Barrett, *Merck: How Much Misery After Vioxx?,* Business Week Online (Nov. 22, 2004).

159.    Pfizer responded to the withdrawal of Vioxx by aggressively marketing its competing COX-2 inhibitors, Celebrex and Bextra. Pfizer announced that it was "confident in the long-term cardiovascular safety of Celebrex." Consequently, prescriptions for Bextra and Celebrex rose sharply after the Vioxx recall. Indeed, only two months after Vioxx's retreat from the market, prescriptions for Celebrex increased by over 40%.  Sales for Celebrex rose 14% in the third quarter of 2004, totaling $747 million, and Celebrex was the company's fourth best selling drug of the quarter.

160.    On October 4, 2004, Pfizer told the *Wall Street Journal* that "studies have consistently not demonstrated any increased cardiovascular risk with Celebrex." Indeed, according to a *New York Times* story that same day, Pfizer "suggested that Celebrex could be good for cardiovascular health."

161.    On October 15, 2004, Pfizer issued a press release, filed with the SEC as an exhibit to a Form 8-K, claiming that "available clinical information for Bextra suggests that there is no increased risk of cardiovascular thromboembolic events in people treated for osteoarthritis (OA and rheumatoid arthritis (RA)." But according to the October 16, 2004 *New York Times,*

45

Pfizer was forced to concede that "Bextra might increase the risk of heart attack or stroke in coronary artery bypass surgery patients." Indeed, Pfizer acknowledged that it had been aware of the study results for at least two months (i.e., since approximately August 2004) during which time it had been strenuously denying any connection between Celebrex or Bextra and heart problems.

162.    Pfizer again reaffirmed Celebrex's safety on November 4, 2004, after a report in Canada's *National Post* questioned the cardiovascular safety of taking Celebrex. Pfizer's press release claimed that Celebrex's safety was "well established" and that "the information provided by the *[National Post]* is uncontrolled and <u>may</u> be secondhand or incomplete."

163.    In response to a New York Times article which reported that "the incidence of heart attacks and strokes among patients given Pfizer's painkiller Bextra was more than double that of those given placebos," Pfizer cited other clinical trials and argued that the *New York Times* article was nothing more than "unsubstantiated conclusions."

164.    In a press release dated December 17, 2004 filed with the SEC as an exhibit to a Form 8-K, Pfizer chairman and chief executive officer Hank McKinnell falsely declared that, "These clinical trial results are new. The cardiovascular findings in one of the studies (APC) are unexpected and not consistent with the reported findings in the second study (PreSAP)."

165.    In annual reports, Pfizer cautioned that if Celebrex "or any of our other major products were to become subject to a problem such as . . . unexpected side effects, regulatory proceedings, . . . or if a new, more effective treatment should be introduced, the impact could be significant." Pfizer Inc. 2000 Annual Report (Form 10-K) (March 28, 2001); Pfizer Inc. 2001 Annual Report (Form 10-K) (March 28, 2002); Pfizer Inc. 2002 Annual Report (Form 10-K) (March 27, 2003). In 2003, Pfizer added to this warning the risk of "material product liability litigation." Pfizer Inc. 2003 Annual Report (Form 10-K) (March 10, 2004); Pfizer Inc. 2004

Annual Report (Form 10-K) (February 28, 2005). At no time, however, did Defendants disclose that Celebrex and Bextra were presently afflicted with the potential problems warned of.

166.    The above examples are not an exhaustive list of Defendants' public statements and fiduciary communications concerning the risks of Celebrex and Bextra. During the Class Period, Defendants made dozens of such statements, including in Pfizer's SEC filings, failing to disclose or minimizing reputable scientific evidence concerning the risks of Celebrex and/or Bextra.

      **C.**    **Defendants Knew Or Should Have Known
That Celebrex And Bextra Presented Cardiovascular Risk**

167.    Contrary to their many public pronouncements and non-disclosures concerning the risks of Celebrex and/or Bextra, during the Class Period Defendants knew or should have known that Celebrex and Bextra presented potential cardiovascular dangers, that these "blockbuster" drugs were not reliable sources of revenue for Pfizer in the long term, and that these drugs posed dangers that were likely to result in massive tort liability. Defendants had access to significant non-public information concerning these risks, as well as access to sophisticated analysis of public information that was not widely appreciated at the time. Throughout the Class Period, Defendants disputed, minimized, and concealed indications that Celebrex and Bextra presented serious risks of cardiovascular injury and gastrointestinal injury, despite evidence that such risk were real. Indeed, after information about potential cardiovascular risks emerged, Pfizer was forced to withdraw Bextra, and add a "black box" warning on Celebrex. Pfizer faces millions of dollars of previously-undisclosed liability from personal injury plaintiffs and shareholders. When the truth emerged, investors recognized that Pfizer stock had been trading at inflated values, leading to a substantial correction.

### 1.     The 1999 National Academy Of Sciences Report

168.    In 1999, Dr. Garrett FitzGerald, an early consultant on COX-2 inhibitors, authored a paper that demonstrated that the urinary metabolite of PGI2 declines significantly when Celebrex is taken by young, healthy adults. By contrast, Celebrex did not decrease the level of the urinary metabolite of TxA2, whose pro-thrombotic effects, owing to decreased PGI2 levels, went unopposed. This study demonstrated that Celebrex, at the cellular level of blood vessel linings, may alter the hemostatic balance between prostacyclin (a COX-2 platelet inhibitor that dilates blood vessels) and thromboxane (a COX-1 platelet activator that constricts blood vessels). McAdam, FitzGerald, et al., "*Systemic biosynthesis of prostacyclin by cyclooxygenase (COX)-2: the human pharmacology of a selective inhibitor of COX-2,*" Proc. Nat'l Acad. Sci. USA, 1999 Jan 5, 96(1):272-7. This could lead to the creation of blood clots.

### 2.     The 1999 Alzheimer's Study

169.    Pharmacia completed a study named by its protocol number IQ5-97-02-001 in 1999. This randomized placebo-controlled one-year study featured the use of 400 mg/day of Celebrex in patients suffering symptoms of Alzheimer's disease. While the study failed to show any use for Celebrex in the treatment of Alzheimer's, it did reveal a statistically significant increased rate (3.6-fold) of serious cardiovascular adverse events associated with use of Celebrex. Additionally, the rate of cardiovascular deaths more than doubled in the Celebrex arm, an increase that was again statistically significant. The Alzheimer's study was never published, although Pfizer scientists and executives had access to the Study's results.

### 3.     The 2000 National Academy Of Sciences Report

170.    In or about August 2000, a study was published revealing that Celebrex significantly impaired the ability of rabbits to withstand temporary experimental coronary artery occlusion (experimental heart attack). This study furnished additional evidence that, by blocking

COX-2, Celebrex may neutralize the cardio protective effects of this important enzyme. As a selective COX-2 inhibitor, this study suggested Celebrex may not only predispose patients to thrombosis, thus causing heart attacks, but could also worsen the severity of their heart attacks. Ken Shinmura, et al., 97 Proceedings Nat'l Acad. Sci. 10197-202 (Aug. 29, 2000).

### 4.     Merck's 2000 VIGOR Study Highlights The Risk Of COX-2 Drugs

171.     In November of 2000, an article on the Vioxx Gastrointestinal Outcomes Research study ("VIGOR") was published in the New England Journal of Medicine, The article. revealed that the Vioxx users in the study were four times more likely to suffer heart attacks than the narproxen users. The marketers of Celebrex used this information to portray Celebrex as less risky than Vioxx, despite their knowledge that VIGOR was consistent with Pfizer's previous and contemporaneous studies showing the risks of COX-2 inhibitors including Celebrex and Bextra.

### 5.     CABG Study #1 (2001)

172.     In seeking approval for Bextra (valdecoxib) and an injectable counterpart known as Dynastat (parecoxib), Pharmacia conducted two clinical trials in patients recovering from post-operative pain. In the first study, 462 patients participated who had undergone coronary artery bypass graft ("CABG") surgery participated in a multicenter, placebo-controlled, double-blind, randomized, parallel group trial ("CABG Study #1"). These patients were given valdecoxib, parecoxib, or placebo. Patients were given an injection of parecoxib 30 minutes after extubation for at least 3 days, and then oral doses of valdecoxib (40 mg) twice a day for up to 11 days. Patients could take morphine or other opioids as needed. While patients taking parecoxib/valdecoxib used less morphine than placebo patients, they suffered twice as many serious adverse events, including "cerebrovascular complications, myocardial infarction, and renal dysfunction." The rate of myocardial infarction ("MI") in the valdecoxib/parecoxib group was twice that reported in the control group (2.6% to 1.3%). *Petition to Remove the COX-2*

*Inhibitors Celecobib (Celebrex) and Valdecoxib (Bextra) From the Market,* (HRG Publication #1720).

173.     FDA medical reviewer Kevin Johnson noted concern in November of 2001: "the excess of serious cardiovascular thromboemoblic events in the valdecoxib area of the CABG trial ... is of note as the entire study population received prophylactic low dose aspirin as part of the standard of care in this setting to minimize just such events. Given the emerging concern over a possible pro-thrombotic action of certain agents in the COX-2 class, these data are of concern." He later wrote, "manifestations of an increase in vascular events rates, which coupled with the signals seen elsewhere in this database ... all contributes to the concern that there may be a component of increased thrombogenicity associated with this agent." K. Johnson, *Valdecoxib,* Food and Drug Administration Medical Officer Review, Nov. 7, 2001; NDA 21,341.

174.     Based upon CABG Study #1, the FDA did not approve Bextra for the treatment of acute pain, opioid-sparing, or for prevention of operative pain.

175.     In June of 2003, Pharmacia co-authored an article on CABG Study #1. E. Ott, et al, *Efficacy and safety of the cyclooxygenase 2 inhibitors parecoxib and valdecoxib in patients undergoing coronary artery bypass surgery,* J. Thorac. Cardiovasc. Stn. 2003 Jun; 125(6):1481-92. The authors conceded that the "serious adverse events occurred twice as frequently in parecoxib/valdecoxib-treated patients ... than in control patients." *Id.* They downplayed the MI findings, lumping them in with other events: "The incidences of other individual serious adverse events, including cerebrovascular complications, myocardial infarctions, and renal function, were proportionally greater by not significantly different between the groups." The MI rate between valdecoxib and placebo was 5 to 1, or 1.6% to 0.7% of their respective patient groups. *Id.* at 1487. The authors noted that the study was intended to direct only certain specific events and was only marginally powered to detect differences in serious adverse events. *Id.* at 1489.

50

### 6.  CABG Study #2 (2001)

176.   Before submitting the NDA for Bextra, Pharmacia conducted a second clinical trial of post CABG surgery patients ("CABG Study #2"), which was not published. In 2004, Pfizer finally released information about CABG Study #2, including the finding that Bextra caused a "significantly greater incidence of events in the cardiovascular/thrombolic category" compared to a placebo (2.0% to 0.5%.).

177.   Information about the findings of CABG Study #1 and CABG Study #2 were not included in either the 2003 or 2004 Bextra product labels. "Cardiovascular events" were merely listed in the "Adverse Reactions" section near the end of the labeling. An accompanying table listing the percentages of specific adverse events only included data from "arthritis trials." 2003 PHYSICIANS' DESK REFERENCE for Bextra at 2703.

### 7.  The 2001 *Circulation* Article

178.    On or about August 14, 2001, another study was published revealing that in dogs in which circumflex coronary artery thrombosis was induced, Celebrex abolished any observed increase in time to occlusion induced by high-dose aspirin and reduced vasodilatation in response to the intracoronary administration of arachidonic acid. The authors concluded that endothelial COX-2-derived prostacylin, which Celebrex inhibits, participates in the cardioprotective effects afforded by high-dose aspirin. The authors stated that the study "raise[d] concerns regarding an increased risk of adverse vascular events in parties receiving" a COX-2 inhibitor like Celebrex and that this "risk may be increased in individuals with underlying inflammatory disorders, including coronary artery disease." Henner, et al., *Effects of Selective Cyclooxygenase-2 Inhibition on Vascular Responses and Thrombosis in Canine Coronary Arteries,* Circulation, 2001 Aug. 14; 104(7):820-5.

### 8.     The 2001 CLASS Study

179.     In a paper published in the August 22, 2001/August 29, 2001, issue of JAMA, cardiologists Eric J. Topol and Steven E. Nissen, chairman and vice chairman, respectively, of cardiovascular medicine at the Cleveland Clinic, along with Dr. Debabrata Mukherjee, reported that the annualized myocardial infarction rate for Celebrex in the Celecoxib Long-Term Arthritis Safe Study ("CLASS") of 0.80% was significantly higher than that in the placebo group of a recent meta-analysis of 23,407 patients in primary prevention trials of 0.52%. The authors concluded that: "Current data would suggest that use of these so-called 'COX-2 inhibitors' might lead to increased cardiovascular events."

180.     Throughout September of 2001, sales of Celebrex and Vioxx dipped. According to the Wall Street Journal, the *JAMA* article "appeared to exacerbate a slowdown in [COX-2] prescription growth some doctors and analysts say was occurring as the novelty of the drug wore off and patients with recurring pain sought new treatments." S. Hensley, *Pharmacia Plans to Show off its Research Pipeline Today,* The Wall Street Journal, Nov. 28, 2001 at B4.

### 9.     The 2004 APPROVe Study, The Withdrawal Of VIOXX, And Concerns About Class-Wide Effects Of COX-2 Inhibitors

181.     In 2004, the Adenomatous Polyp Prevention on Vioxx (APPROVe) study revealed a statistically significant increased risk of confirmed cardiovascular events (principally heart attacks and strokes) in patients taking 25 mg/day of Vioxx compared to those ingesting a placebo.

182.     On September 30, 2004, Merck announced the withdrawal of Vioxx from the market.

183.     On October 8, 2004, Dr. Garrett FitzGerald published an editorial in The New England Journal of Medicine contending that the cardiovascular side effects that led Merck's

Vioxx to be pulled from the market likely affect all COX-2 inhibitors. K. Talley, *Pfizer, J&J Fall, but Abercrombie Rises,* The Wall Street Journal, Oct. 8, 2004 at C3. That same day, the market reacted strongly: Pfizer's stock price fell $1.19 per share (or 3.8%) to $29.99, making it the industrial average's poorest percentage performer.

### 10.    The October 2004 Warning Letter

184.    On October 15, 2004, Pfizer sent out a "Dear Doctor Letter" warning physicians that Bextra might increase the risk of heart attacks or stroke in coronary artery bypass surgery patients. However, Pfizer's press release reassured that the, "available clinical information for Bextra suggests that there is no increased risk of cardiovascular thromboembolic events in people treated for osteoarthritis ("OA") and rheumatoid arthritis (RA)."

185.    Pfizer was publicly criticized for not issuing this warning letter sooner because it was based on CABG Study #1, which had been completed in the spring of 2001.

### 11.    Meta-Analysis Presented To The American Heart Association

186.    On November 9, 2004, Dr. FitzGerald presented a paper to the American Heart Association regarding the CABG studies and Bextra. The meta-analysis of the clinical trials showed increased heart attacks or strokes among patients given Bextra compared with those given placebo. Dr. FitzGerald stated that "the magnitude of the signal with Bextra is even higher than what we saw in Vioxx. This is a time bomb waiting to go off." A colleague of Dr. FitzGerald who participated in the study, Dr. Curt Furberg, stated, "Basically, we showed that Bextra is no different than Vioxx, and Pfizer is trying to suppress that information." G. Harris, *New Study Links Pfizer's Bextra, Similar to Vioxx, to Heart Attacks,* The New York Times, November 10, 2004.

### 12.    The FDA Requires A Black Box Label For Bextra

187.    On December 10, 2004, the FDA approved a new label for Bextra, which included a "black box" warning regarding cardiovascular risks for patients who recently had coronary artery bypass graft surgery and updating the warning on Stevens-Johnson Syndrome.

### 13.    The 2004 APC Study

188.    On December 17, 2004, Pfizer announced that the National Cancer Institute's ("NCI") Adenoma Prevention with Celecoxib ("APC") trial implicated Celebrex in a statically significant elevation in the risk of major fatal or non-fatal cardiovascular events (a composite endpoint of cardiovascular death, acute myocardial infarction, and stroke) when compared to a placebo group. This evidence of cardiovascular toxicity was dose-dependent: the hazard ratio at 400 mg/day of Celebrex was 2.5, while that at 800 mg/day was 3.4. Due to this unacceptable danger, the NCI prematurely terminated the study.

189.    The FDA publicly remarked that the APC trial findings are similar to recent results from a study of Vioxx (rofecoxib), another drug in the same class as Celebrex. Statement The FDA requested that Pfizer immediately suspend all television, newspaper and radio advertising of Celebrex to consumers and alter its marketing to doctors.

### 14.    Suspension Of The NIH Colon Cancer Study

190.    On December 17, 2004, the National Institute of Health ("NIH") announced that it had suspended colon cancer studies involving Celebrex. NIH director Elias Zerhouni stated that the NIH would immediately review other federal studies involving COX-2 inhibitors.

### 15.    Suspension Of Pfizer's Direct Advertising

191.    On or about December 19, 2004, The Wall Street Journal Online announced that Pfizer agreed to discontinue all "direct-to-consumer" advertising for Celebrex and Bextra.

### 16.     FDA Advice To limit Use Of Celebrex And Bextra

192.    On December 24, 2004, the New York Times reported that the FDA issued a public health advisory that "recommended ... that doctors limit prescriptions for the popular pain pills Celebrex and Bextra because recent studies have suggested that they may increase the risk of heart attack and stroke."

### 17.     Meta-Analysis Presented In *Circulation*

193.    On January 17, 2005, the journal *Circulation* ran an article by Furberg and FitzGerald discussing their meta-analysis of the CABG trials for Bextra. The authors noted that, "Although the treatment—placebo difference did not reach conventional levels of statistical significance for the individual trials, valdecoxib in the combined analysis was associated with a 3-fold higher risk of cardiovascular events than placebo." *Parecoxib, Valdecoxib, and Cardiovascular Risk,* Circulation, 2005 Jan 25;111(3):249.

194.    On January 18, 2005, a Reuter's story on the Furberg & FitzGerald article in *Circulation* noted that "Pfizer Inc.'s Bextra can triple the risk of heart attack and stroke in certain patients."

### 18.     Public Calls To Remove Celebrex And Bextra From The Market

195.    On January 24, 2005, the non-partisan non-profit group Public Citizen filed a petition with the FDA to remove Celebrex and Bextra from the market. The group reviewed 14 clinical studies for Celebrex and Bextra and found in only one was there a difference in efficacy between the COX-2 inhibitor and other NSAIDs. They further found "neither drug exhibited a decrease in clinically significant upper GI events." Moreover, "statistically significant increase cardiovascular risk has been demonstrated in every COX-2 inhibitor that has been approved." *Petition to Remove the COX-2 Inhibitors Celecobib (Celebrex) and Valdecoxib (Bextra) Frain the Market,* (HRG Publication #1720).

196.     On January 29, 2005, the New York Times reported that Kaiser Permanente, one of America's largest managed care organizations, had ordered its pharmacies to stop dispensing Bextra.

### 19.     Pfizer Failed To Disclose Earlier Test Results Questioning The Safety Of Celebrex

197.     Pfizer did not publicly disclose the existence of the 1999 Alzheimer's Study until January 2005, when it posted a brief summary of it on the website of the Pharmaceuticals Research Manufacturers Association. According to Public Citizen Health Research Group, after that group petitioned the FDA to remove Bextra and Celebrex from the market, Pfizer revised the posting to concede that a "statistically significant difference favoring placebo in adverse events was observed in this study for certain adverse cardiovascular events." See also, Public Citizen, Jan. 31, 2005 "Letter to FDA revealing heart dangers in an unpublished clinical trial of Celebrex (HRG Publication #1721)".

198.     On February 1, 2005, the Boston Globe reported on the 1999 Alzheimer's study, stating, "Pfizer, Inc, has revealed it completed a study four years ago that links its painkiller Celebrex to a 'statistically significant' increase in heart problems. The recent disclosure ... appears to contradict recent statements by the company."

199.     Two doctors who reviewed the safety of Celebrex for the FDA in 2001 noted that they had not known about the 1999 Alzheimer Study until late January 2005. One of them, Dr. Kenneth Brandt, a professor of medicine at Indiana School of Medicine, said that if the study safety panel had known about the 1999 Alzheimer Study, the panel would have recommended that both Vioxx and Celebrex be prescribed with greater caution. Because the safety panel was not informed about the 1999 Alzheimer Study at the time of its 2001 review, the panel recommended that Vioxx, but not Celebrex, should carry a warning of cardiovascular risks.

**20.    FDA Advisory Committees Confirm That Celebrex And
Bextra Present Increased Risk Of Cardiovascular Injury**

200.    In or about mid-February 2005, two FDA advisory committees -- the Arthritis Advisory Committee and the Drug Safety and Risk Management Advisory Committee -- jointly met and unanimously concluded, inter alia, that an increased risk of cardiovascular adverse events has been demonstrated for both Celebrex and Bextra.

201.    In an April 6, 2005 memorandum, John K. Jenkins, M.D., Director, FDA's Office of New Drugs and Paul J. Seligman, M.D., M.P.H., Director, FDA's Office of Pharmacoepidemiology and Statistical Science, enunciated FDA's conclusion that Celebrex and Bextra, like the withdrawn Vioxx, are associated with an increased risk of serious adverse cardiovascular events compared to placebo, and the available data do not permit a rank ordering of these drugs relative to their cardiovascular risk.

**21.    FDA Rejection Of Injectable Bextra**

202.    On September 20, 2005, the FDA rejected approval of Dynastat (parecoxib), an injectable formulation of Bextra.

**D.    Defendants Knew Or Should Have Known
That Celebrex And Bextra Presented Gastrointestinal Risk**

203.    Not only did the Defendants understate the CV risks of Celebrex and Bextra, they overstated the supposed GI benefits of Celebrex. As this became clearer to the public, Pfizer's stock suffered, hurting the Plaintiffs.

**1.    The FDA Prohibited Pfizer From Claiming
Any Gastrointestinal Benefit From Celebrex**

204.    As noted above, the FDA did not permit a GI safety superiority claim for Celebrex, and required that the drug carry the same warning about possible GI toxicity as did NSAIDs. The FDA permitted the label to recite the findings of pre-launch endoscopic studies,

but required Pfizer to qualify them with the statement that the "correlation between findings of endoscopic studies, and the relative incidence of clinically serious upper GI events that may be observed with different products, has not been fully established." The FDA advised Pfizer that "any promotional use of the endoscope data without the qualifying explanations of that data found in the approved labeling . . . will be considered false and/or misleading."

205.    At no time has the FDA permitted Celebrex to claim increased gastrointestinal safety over traditional NSAIDs or to otherwise maintain superiority in safety or efficacy to such drugs. Beginning with its December 1998 letter approving the Celebrex NDA, the FDA advised Celebrex's marketers that "promotional activities that make or imply comparative claims about the frequency of clinically serious GI events compared to groups of NSAIDs or specific NSAIDs will be considered false and/or misleading without differences having been demonstrated in adequate, well-controlled studies."

### 2.    Pfizer's Treatment Of The CLASS Study Created The Impression That Celebrex Offered Gastrointestinal Benefits

206.    The FDA conditioned its initial approval of Celebrex on completion of a Phase 4 post-marketing study of the comparative gastrointestinal safety profile of Celebrex, which became known as the Celecoxib Long-Term Arthritis Safety Study ("CLASS").

207.    The CLASS trial was a long-term, double-blind study that ultimately involved 8,059 patients taking Celebrex, ibuprofen or diclofenac to treat rheumatoid arthritis and osteoarthritis. It actually combined two identically designed studies comparing the incidence of "clinically significant upper gastrointestinal adverse events" ("CSUGIE") associated with Celebrex 400 mg taken twice daily -- one comparing it to ibuprofen 800 mg taken three times a day (Study 035) and the other with diclofenac 75 mg taken twice daily (Study 102).

208.     When the CLASS study was completed, the results were reported to the FDA as part of a request to remove a gastrointestinal safety warning from the Celebrex package insert. Pharmacia made this request in the Supplemental NDA it submitted to the FDA on or about June 12, 2000.

209.     The study sponsors wanted CLASS to demonstrate that Celebrex significantly reduced serious GI complications over other NSAIDs, so that the FDA could be persuaded to permit removal of the NSAID class GI toxicity warning from the Celebrex label. Pfizer and Pharmacia deemed removal of this warning as critical to competing against other NSAIDs based on superior safety to the GI tract.

210.     Findings from the *first six months* of the CLASS study were widely circulated by Pfizer and Pharmacia, and were published in the September 13, 2000, issue of The Journal of the American Medical Association (JAMA). Silverstein, et al., *Gastrointestinal Toxicity With Celecoxib vs Nonsteroidal Anti-inflammatory Drugs for Osteoarthritis and Rheumatoid Arthritis. The CLASS Study: A Randomized Controlled Trial,* JAMA, 2000 Sep. 13;284(10):1247-55. The article concluded that Celebrex, "when used for 6 months... is associated with a lower incidence of clinical upper GI events than comparator NSAIDs (ibuprofen and diclofenac)."

211.     The CLASS Study, as initially presented in JAMA, was widely publicized by Pfizer. As of June 2002, about 30,000 reprints of CLASS were bought from the publisher and a recent search of the Science Citation Index yielded 169 articles citing the study, more than 10 times as many citations as any other article published in the same issue. The reprints were used by the Celebrex sales team to entice doctors to prescribe Celebrex. The wide distribution of CLASS coincided with increased sales of Celebrex.

### 3.     Pfizer Failed To Disclose The Full
###         Results Of The CLASS Study Until February 2001

212.    Pfizer and the authors of the JAMA article presented only six months of data from the CLASS Study, but the drug administration phase of the study actually lasted ***12 months.***

213.    When all of the CLASS data were considered, most or all of Celebrex's purported safety advantage disappeared. Six of the seven serious gastrointestinal complications occurring during the second half of the study were in Celebrex users.

214.    The data for the final six months of CLASS became known when Pfizer and Pharmacia appeared before an FDA Advisory Committee considering a proposed GI label change in February of 2001. The results of the CLASS study were also eventually supplied to the FDA's Arthritis Drugs Advisory Committee ("the Advisory Committee"), which reviewed them at its meeting on February 7, 2001.

215.    The Advisory Committee determined that "the sponsor's presentation of 6-month data . . . are not statistically valid or supportable," and its gastroenterology reviewer concluded that the first six months of data did not merit separate consideration. Moreover, based on data from the entire year of the study, the Advisory Committee found that "the sponsor has failed to demonstrate a statistically significant lower rate" of serious GI complications in Celebrex as opposed to other NSAID users. In fact, during the second six months of CLASS, the risk of serious GI complications associated with Celebrex appeared to be higher than that associated with "both ibuprofen and diclofenac." The Advisory Committee concluded that patients taking Celebrex had not been shown to experience fewer gastrointestinal complications than those taking traditional NSAIDs. Celebrex had failed to achieve its primary endpoint of reduced "clinically significant serious gastrointestinal events." Accordingly, the Advisory Committee recommended that the Celebrex package insert continue to contain the same gastrointestinal

warnings as traditional NSAIDs, and advised that further studies be undertaken to assess the risk of COX-2 inhibitors when taken with aspirin.

216.    The medical community condemned Pfizer and Pharmacia's touting of the CLASS Study results based on partial data rather than the complete data set. Dr. M. Michael Wolfe, a Boston University gastroenterologist who praised the initial CLASS results, said he was "flabbergasted" and "furious" that he had praised a study based on incomplete data, which made him look "like a fool." In a similar vein, JAMA's editor, Catherine D. DeAngelis, admitted to being "disheartened to hear that they [Pfizer and Pharmacia] had those data at the time" the manuscript of the article was submitted to JAMA. She stated she was "very upset when I found out that they had a full year's data." Likewise, JAMA deputy editor Drummond Rennie stated that Pharmacia, as well as the study's authors, "were not open with us." T. Burton & G. Harris, *Note of Caution: Study Raises Specter Of Cardiovascular Risk For Hot Arthritis Pills -- Vioxx and Celebrex Marketers Dispute the Research, Sought to Downplay It -- A Spurned Appeal to JAMA,* The Wall Street Journal Aug. 22, 2001 at Al.

### 4.    The FDA Again Rejects Claims That Celebrex Offers Gastrointestinal Benefits

217.    On or about June 7, 2002, the FDA officially denied Pharmacia's request for permission to sell Celebrex without a GI warning in the label. The label maintained that, "Differences in the incidence of complicated ulcers between Celebrex and the combined group of ibuprofen and diclofenac were not statistically significant." In a written release, the FDA explained that the CLASS study "did not show a safety advantage in upper gastrointestinal events for Celebrex compared to either ibuprofen or diclofenac."

### 5.   Subsequent Studies Confirm That Celebrex
### Does Not Provide Gastrointestinal Advantages

218.   Subsequent studies confirm that Celebrex is not more effective than other, cheaper NASIDs in terms of gastrointestinal risk. On December 26, 2002, the New England Journal of Medicine published a study comparing the recurrence of upper GI bleeds among patients taking Celebrex and those taking the NSAID diclofenac along with the ulcer medicine omeprazole (the now generic compound sold as Prilosec). The authors found treatment with the less expensive NSAID and omeprazole to be as effective as the more expensive COX-2 inhibitor. Chan, et al, *"Celecoxib versus Diclofenac and Omeprazole in Reducing the Risk of Recurrent Ulcer Bleeding in Patients with Arthritis,"* N. Engl. J. Med., 2002 Dec 26;347(26):2104-10.

219.   On December 3, 2005, the British Medical Journal published an analysis of British researchers examining the incidence of GI toxicity among patients taking NSAIDS and COX-2 inhibitors including Celebrex. The researchers utilized a database containing the records of over 7 million patients ever registered with 468 practices over the past 16 years throughout every strategic health authority and each health board in England, Wales, and Scotland. They found, "No consistent evidence was found of enhanced safety against gastrointestinal events with any of the new cyclo-oxygenase-2 inhibitors compared with non-selective non-steroidal anti-inflammatory drugs." Hippisley-Cox J, et al, *Risk of adverse gastrointestinal outcomes in patients taking cyclo-ogenase-2 inhibitors or conventional non-steroidal anti-inflammatory drugs: population based nested case-control analysis,* B.M.J. 2005 Dec. 3; 331(7528):13101316.

### E.   Ultimately, The FDA Imposed A "Black Box" Warning
### Label On Celebrex And Pulled Bextra From The Market

220.   New studies confirm the now well-recognized fact that Celebrex presents an increased risk of cardiovascular injury. A 2006 study reported that Celebrex doubles the risk of heart attack. B. Caldwell, S. Aldington, M. Weatherall, P. Shirtcliffe & R. Beasley, *Risk of*

*Cardiovascular Events and Celecoxib: A Systematic Review and Meta-Analysis,* J. R. Soc. Med. 2006; 99:132-40 (March 2006). One of the authors of that study, Professor Richard Beasley, told Reuters that the cardiovascular risk was common to the entire class of drugs known as COX-2 inhibitors.

221.    The FDA has specific requirements on the content and format of labeling of human prescription drugs. One requirement concerns product label warnings. In general, the FDA has three levels of such warnings, including, in order of the last to most serious: (a) contraindications; (b) cautionary statements; and (c) black box warnings.

222.    A contraindication describes situations in which the prescription drug should not be used because the risk of use clearly outweighs the benefits. Contraindications instruct patients not to take a particular medicine if they are taking another medication or suffering from a pre-existing condition that would cause the patient to have a particular hypersensitivity to use of the drug. For example, many medicines should not be used by women during pregnancy.

223.    A cautionary statement describes serious adverse reactions and potential safety hazards, limitations in use imposed by them, and the steps that should be taken should they occur, in connection with the use of the prescription drug. Celebrex and Bextra, for example, were both required to contain since their approval by the FDA, the same cautionary statements all NSAIDS are required to carry concerning gastrointestinal risks.

224.    The black box warning is the most serious warning placed in the labeling of prescription medication. Black box warnings are used by the FDA for special problems, particularly those that may lead to death or serious injury. Black box warnings must be prominently displayed in the labeling of the prescription medicine in an area determined by the FDA. Other than pulling the drug from the market, the black box label is the most potent warning in the FDA's arsenal, and often has a significant negative impact on a drug's sales.

Physicians tend not to prescribe drugs with a black box warning because they fear liability if an adverse event occurs and the label clearly states why the drug should not be prescribed.

225.    The inclusion of the black box warning to Celebrex's label would turn out to be a "death knell" for Pfizer's Celebrex drug sales. By the end of the Class Period, it became clear that Celebrex sales had been negatively impacted by the inclusion of the above black box warning.

226.    The FDA requested that Pfizer change the Celebrex label after considering the presentations, discussions, and recommendations from the joint meeting of the FDA's Arthritis and Drug Safety and Risk Management Advisory Committees held on February 16, 17, and 18, 2005. The Committees informed the FDA that "for at least the three approved COX-2 products [Vioxx, Celebrex and Bextra], a class effect appears to be present." The Committees also reported that "the GI [gastrointestinal] benefits of the COX-2s appear to be less than first reported ... *[with] no clear data that show GI benefit[s] for Celebrex and Bextra."* (emphasis added).

227.    Today, Pfizer's Celebrex website states: ***"Important Information: CELEBREX may increase the chance of a heart attack or stroke that can lead to death."*** (Emphasis added).

228.    On April 7, 2005, in the same press release in which it announced the "black box" label for Celebrex, Pfizer announced that it had been told by the FDA to remove Bextra from the market. Pfizer stated that:

> Pfizer respectfully disagrees with FDA's position regarding the overall risk/benefit profile of Bextra. However, in deference to the agency's views, the company has agreed to suspend sales of the medicine pending further discussions with the FDA. Pfizer said it will explore options with the agency under which the company might be permitted to resume making Bextra available to physicians and patients. For now, patients should stop taking Bextra and contact their physicians about appropriate treatment options.

229.    In response to the removal of Bextra, drug industry analyst C.J. Sylvester at Banc of America said that Bextra withdrawal took him by surprise, noting it came just two days after Pfizer executives said sales of the arthritis drugs would be reinvigorated in coming months. Sylvester wrote in a research report that: "The big surprise is the FDA's request for the withdrawal of Bextra given that the advisory committee (to the FDA) voted that Bextra should remain on the market back in mid-February."

230.    The FDA has also noted a pattern of Pfizer failing to disclose or minimizing the risks of Celebrex. On or about February 1, 2001, the FDA sent a "Warning Letter" citing Pharmacia for minimizing the contraindications and risks associated with Celebrex use and making unsubstantiated comparative claims of its superiority to other NSAIDs. The Warning Letter concluded as follows:

> Your promotional activities described above raise significant health and safety concerns in that they minimize crucial risk information and promote Celebrex for unapproved new uses. In two previous untitled letters dated October 6, 1999, and April 6, 2000, we objected to your dissemination of promotional materials for Celebrex that contained unsubstantiated comparative claims, and lacked fair balance. Based upon your written assurance that this violative promotion of Celebrex had been stopped, we considered these matters closed. Despite our prior written notification and notwithstanding your assurances, Pharmacia has continued to engage in false or misleading promotion of Celebrex.

231.    On October 16, 1999, the FDA cited Searle for false and misleading advertising claims of superiority for the safety and effectiveness of Celebrex. The letter identified Celebrex promotional materials that violated the Federal Food, Drug and Cosmetic Act (FDCA) because they contained unsubstantiated comparative claims of superiority with regard to other NSAIDs, misrepresented the safety profile of Celebrex, and lacked fair balance regarding the drug's risks.

232.   The April 2000 FDA letter identified promotional materials for Celebrex that violated the FDCA. The FDA found the materials misrepresented the safety profile of Celebrex compared to other NSAIDs, and failed to provide any risk information concerning the use of Celebrex. The marketing materials also contained "several unsubstantiated comparative claims comparing Celebrex to Vioxx."

233.   In addition, in November 2000, the FDA issued yet another letter regarding Celebrex. The FDA told Pfizer and Pharmacia to stop running a TV commercial that suggested arthritis patients could "play in the park" as a result of Celebrex, and "overstate[d] the efficacy" of the drug.

234.   In connection with the removal of Bextra from the market, Pfizer recorded charges totaling $1.2 billion in 2005.

**F.    Pfizer Faces Other Significant Risks, Which Made The Problems With Celebrex And Bextra Even More Significant**

235.   In addition to the fallout relating to Celebrex and Bextra, including investigations by the SEC, Department of Justice, various state attorneys general, as well as private litigation, Pfizer faced other significant risks, which make the problems with Celebrex and Bextra even more significant.

236.   According to one analyst, Pfizer has lost or will lose patent protection in the next few years on drugs that generated more than $11 billion in worldwide sales in 2005. While Pfizer is launching some new products, they are estimated to raise only about $8 billion in sales by 2010. This fact, which the Pfizer Defendants knew or had reason to know, is a further consideration making Pfizer Plans investments in Company Stock and the Company Stock Funds imprudent during the Class Period.

237.   In May 2004, Pfizer pled guilty to federal criminal charges related to its illegal marketing of Neurontin, and paid a $430 million fine. This we-publicized event was another "red flag" that Pfizer was being seriously mismanaged. This fact, which the Pfizer Defendants knew or had reason to know, is a further consideration making Pfizer Plan investments in Company Stock and the Company Stock Funds imprudent during the Class Period.

238.   Pfizer stock has underperformed the American Stock Exchange Pharmaceutical Index, a key industry measure, since July 2004, which is another "red flag" that Pfizer stock is an imprudent investment.

239.   During the Class Period, Defendants were aware, or on inquiry notice, of numerous serious problems that rendered Company Stock and the Company Stock Funds imprudent for the Plans and their participants and beneficiaries. Defendants abused their discretion as Plan fiduciaries by failing to conduct an adequate investigation of these risks, and by failing to take proper action to protect the Plans against large, and entirely avoidable, losses. Defendants' conduct impaired the purpose for which the Plans were established.

**G.     The ERISA Plans That Owned Pfizer Stock Suffered Substantial Losses**

240.   With Bextra no longer on the market and diminishing prospects for Celebrex, the Plans have suffered a substantial loss. On December 17, 2004 alone, over 113 million shares of the Company's stock were traded in just 90 minutes, compared to the average 33 million shares traded in a day. The Company's stock dropped precipitously, losing over 11% of its value. For the Plans and their participants, millions of dollars in retirement savings were wiped out overnight.

241.   On December 30, 2004, the *Wall Street Journal* reported that "new prescriptions for . . . Celebrex plummeted 56% last week in the U.S., just after a federal study found a link between Celebrex and a heightened risk of heart attacks and strokes."

242.    In October of 2005, Pfizer issued a press release in which it conceded that the regulatory actions relating to Celebrex and the suspension of sales of Bextra contributed to an additional decline in third-quarter 2005 selective COX-2 inhibitor worldwide revenues of $754 million (down 67%) and year-to-date selective COX-2 inhibitor worldwide revenues of $2.0 billion (down 62%) in comparison to the same periods in the prior year.

243.    The Plans suffered hundreds of millions of dollars in losses because substantial assets of the Plans were imprudently invested or allowed to be invested by Defendants in Company Stock and the Company Stock Funds during the Class Period, in breach of Defendants' fiduciary duties.   Defendants failed to diversify the Plans' assets and available investment options when they knew or should have known that Company Stock was an imprudent retirement investment.   These losses are not the result of normal market forces, but are the direct result of something unusual and outside the ordinary course of business: bad acts and serious mismanagement by corporate employees charged with fiduciary responsibilities under the Plans.

244.    Defendants are liable for the Plans' losses. Indeed, Defendants failed to take the necessary and required steps to ensure any effective and informed independent participant control over the investment decision-making process, as required by ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated thereunder.   Defendants withheld material, non-public facts from participants, and provided inaccurate and incomplete information to them regarding the true health and ongoing profitability of Pfizer or Pharmacia, and the soundness of Company Stock and the Company Stock Funds as an investment vehicle. As a consequence, participants did not exercise independent control over their investments in the Company Stock or the Company Stock Funds. Defendants remain liable under ERISA for losses caused by such investments. Defendants, not the participants, exercised control over the extent to which the Company Stock Fund acquired and held Company Stock.

245.    Had the Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning investment in Company Stock, eliminating Company Stock or the Company Stock Funds as an investment alternative when it became imprudent and divesting the Plans of Company Stock or the Company Stock Funds when maintaining such an investment became imprudent, the Plans would have avoided some or all of the tosses that they, and indirectly, the Plans' participants suffered.

## VI.    THE RELEVANT LAW

246.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

247.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be: personally liable to make good to such plan any losses to the plan resulting from each such breach; personally liable to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary; and subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

248.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants to seek equitable relief from plan fiduciaries, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

249.    ERISA §§ 404(a)(1)(A) and (a)(1)(B), 29 U.S.C. §§ 1104(a)(1)(A) and (a)(1)(B) provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar

with such matters would use in the conduct of an enterprise of a like character and with like aims.

250.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (a)(1)(B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things:

A.    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Pfizer Stock Fund, which invested in Pfizer stock, to ensure that each investment is a suitable option for the plan;

B.    The duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

C.    The duty to diversity investments of plan assets to avoid large losses; and

D.    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

251.    ERISA requires a Plan fiduciary to manage the investment of plan assets, including in this instance the Pfizer Stock Fund, which invested in Pfizer stock.  Such a plan fiduciary must also ensure that only prudent investments are offered as plan options, and monitor such investments to ensure that they remain prudent and suitable for the plan.  This includes the duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives of a plan, including in this instance the Pfizer Stock

Fund, which invested in Pfizer stock, to ensure that each investment is a suitable option for the Plans.

252.    A fiduciary must avoid conflicts of interest and resolve them promptly when they do occur.  As such, a plan fiduciary must always administer a plan with a single eye to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

253.    ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for Breach by Co-Fiduciary," provides, in pertinent part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;
>
> (2) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

254.    Co-fiduciary liability is an important part of ERISA's regulation of fiduciary responsibility.  Because ERISA permits the fractionalization of the fiduciary duty, there may be, as in this case, several ERISA fiduciaries involved in a given issue, such as the role of company stock in a plan.  In the absence of co-fiduciary liability, fiduciaries would be incentivized to limit their responsibilities as much as possible and to ignore the conduct of other fiduciaries.  The result would be a setting in which a major fiduciary breach could occur, but the responsible party

could not easily be identified.  Co-fiduciary liability obviates this.  Even if a fiduciary merely

knows of a breach, a breach he had no connection with, he must take steps to remedy it:

> [T]he most appropriate steps in th[is] circumstance may be to
> notify the plan sponsor of the breach, or to proceed to an
> appropriate Federal court for instructions, or bring the matter to the
> attention of the Secretary of Labor.  The proper remedy is to be
> determined by the facts and circumstances of the particular case,
> and it may be affected by the relationship of the fiduciary to the
> plan and to the co- fiduciary, the duties and responsibilities of the
> fiduciary in question, and the nature of the breach.

1974 U.S.C.C.A.N. 5038, 1974 WL 11542, at 5080.

255.    Plaintiff therefore brings this action under the authority of ERISA § 502(a)(2) for

relief to the Plan under ERISA § 409(a) to recover losses sustained by the Plan arising out of the

breaches of fiduciary duties by the Defendants in violation of ERISA § 404(a)(1) and ERISA §

405(a).

256.    Insofar as any Defendant is sued alternatively as a knowing participant in a breach

of fiduciary duty for equitable relief, Plaintiff proceeds, pursuant to ERISA § 502(a)(3), 29

U.S.C. § 1132(a)(3).

## VII.    CAUSES OF ACTION

### A.    Count I:  Breach Of Fiduciary Duty To Diversify

257.    Plaintiffs incorporate by this reference the paragraphs above.

258.    This Count alleges fiduciary breach of the fiduciaries' duty to diversify

investments of plan assets so as to minimize the risk of large losses *unless* under the

circumstances it is clearly prudent not to do so.

259.    Under ERISA §404(a)(1)(C) a fiduciary is required to ". . .diversify the

investments of a plan so as to minimize the risk of large losses."  The individual Plans at issue in

this case and the Plans as a whole were undiversified for large portions of the Over-Concentration Class Period.

260.    The Plans at issue in this case are not statutorily exempt from the duty of diversification because of several features of the plans that do not allow them to qualify as eligible investment account plans ("EIAPs") under either IRS regulations or ERISA.  In fact, all of the Plans at issue in this case are organized to meet the requirements of Puerto Rico's General Reverse Code, not the IRS Code.

261.    As of October 31, 2001, the Warner-Lambert Master Trust, (wherein the W-L Plan's assets were held) held approximately 75% of its assets in Pfizer stock.  As of October 31, 2002 the percentage was approximately the same.  In 2001, however, equity funds made up approximately 15% of the assets but only approximately 8% in 2002.

262.    As of year end 2002, the W-L Plan had a total value of $38,591,000 compared to $46,899,000 at the end of 2001.

263.    On June 19, 2000, Pfizer, Inc. completed a merger with Warner-Lambert Company.  In connection with the merger, Pfizer, Inc. adopted and assumed the W-L Plan.

264.    In 2001 and 2002, the W-L Plan offered eight investment alternatives, two of which were Pfizer stock funds.  Six of the eight funds were exclusively or mostly stock funds. All of the investment alternatives were funds sponsored by T. Rowe Price except for the two Pfizer stock funds.  T. Rowe Price was the W-L Plan's trustee and charged with fiduciary responsibilities for plan assets and administration.

265.    Effective April 2003 the W-L Plan was merged into the PSIP Plan to form a new plan: The Pfizer Savings Plan for Employees Resident in Puerto Rico (PSP Plan).

266.    As of the end of 2009, the PSP Plan had a total value, net of liabilities, of $101,119,244.  A total of 5,635 persons were participants or beneficiaries of the PSP Plan at the end of the year.

267.    As of the end of 2004, the PSP Plan had net assets available for plan benefits of approximately $47.4 million of which $41.9 million was invested in Pfizer stock.

268.    In 2001, the PSIP Plan offered only six investment alternatives, five of which were common stock funds.  Accordingly, the PSIP Plan participants were not offered a diversified choice of alternative investments.

269.    The failure to diversify contributed to the approximately $9.2 million unrealized depreciation of investments for the year ended 2001.

270.    For the year ended 2001, while Banco Popular de Puerto Rico was the trustee of the PSIP Plan all of the investment alternatives were offered by "parties-in-interest."

271.    As of December 31, 2006, the PSP Plan had total assets of approximately $83.6 million, of which approximately $48 million was invested in Pfizer common stock.

272.    As of December 31, 2005, the PSP Plan had net assets available for plan benefits of approximately $77 million of which $45.59 million was invested in Pfizer stock.  Of the eight investment alternatives offered to participants, five were common stock investments.

273.    As of December 31, 2004, the PSP Plan had net assets available for plan benefits of approximately $80.3 million of which approximately $53.5 million was invested in Pfizer stock.  During 2004, Pfizer stock value declined approximately $17 million.

274.    As of December 31, 2003, the PSP Plan had net assets available for plan benefits of approximately $92.7 million.

B.      **Count II:  Failure To Prudently And Loyally
        Manage The Plans And Assets Of The Plans**

275.    Plaintiffs incorporate by this reference the paragraphs above.

276.    This Count alleges fiduciary breaches against the following Defendants:   the Pfizer Defendants, the Pfizer Director Defendants, and the Pfizer Plan Committee Defendants, (collectively, the "Prudence Defendants").

277.    As alleged above, during the Prudence Class Period the Prudence Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

278.    As alleged above, the scope of the fiduciary duties and responsibilities of the Prudence Defendants included managing the assets of the Plans for the sole and exclusive benefit of the Plans' participants and beneficiaries, and with the care, skill, diligence, and prudence required by ERISA.   As such, the Prudence Defendants were responsible for, among other things, selecting prudent investment alternatives and eliminating imprudent investment alternatives for the Plans.   Further, with respect to the Plans, each Prudence Defendant were responsible for, among other things, determining whether and to what extent the assets of the Plans (including those that would otherwise be invested in Company stock) should be held in short term low risk investments.   The Prudence Defendants were responsible for determining the extent to which employees would be permitted to invest in those investment alternatives (including the Pfizer Stock Fund).   As alleged previously, the Prudence Defendants thus exercised *de facto* authority and control with respect to the *de jure* responsibilities of the other Prudence Defendants, making themselves fully responsible for the prudent and loyal fulfillment of the *de jure* responsibilities assigned by the governing Plan documents to the other Prudence

Defendants, without relieving them of any such responsibility. In carrying out these responsibilities, the Prudence Defendants were required to evaluate the merits of the Plans' investments on an ongoing basis and take all necessary steps to ensure that the Plans' assets were invested prudently.

279. Yet, contrary to their duties and obligations under ERISA, the Prudence Defendants failed to loyally and prudently manage the Plan assets. Specifically, during the Prudence Class Period, these Defendants knew or should have known that Pfizer common stock was no longer a suitable and appropriate investment for the Plans, but was, instead, a highly speculative, risky investment in light of the Company's improper business practices, serious mismanagement, accounting improprieties, misstatements, and omissions that caused the price of Pfizer stock to be artificially inflated. The impending collapse of the stock price resulted from these dire circumstances. Nonetheless, during the Prudence Class Period, these Defendants exercised the authority and control that made them fiduciaries to continue to offer Pfizer stock as an investment alternative in the Plans. Although Pfizer stock was removed as a Employer Matching Contribution option in May 4, 2009, this action was too little too late—the stock had already plummeted in value to roughly $2 a share, and the Defendants failed to take any action to divest the Plans of Pfizer stock, or to diversify the Plans' holdings to reduce their concentration in Pfizer stock.

280. Throughout the Prudence Class Period, Defendant Pfizer had actual knowledge that its shares had become a risky and inappropriate investment based on, *inter alia*, the following: (a) the aggressive growth of its CDS business tied to the failing mortgage securities markets, even after subprime mortgage defaults increased, housing prices fell, credit markets deteriorated, the subprime MBS markets became illiquid, and the CDO markets took major losses, (b) the accumulation of over $500 billion in exposure to CDS, with roughly $80 billion of

that directly tied to subprime related securities, which constituted nearly four times the amount of Pfizer's available excess capital during the Prudence Class Period; (c) the failure to acknowledge, control, and manage the risks embedded in the CDS portfolio, including market and pre-settlement risk; (d) the failure to hedge the over $500 billion CDS portfolio; (e) the failure to provide complete and accurate information and the omissions of material fact regarding the risks embedded in the CDS portfolio; (f) the lack of proper internal controls over risk management and Pfizer FP; (g) Defendant Pfizer's knowledge that collateral calls could stretch the company beyond its available excess capital and its failure to take timely steps to obtain more capital, close out the CDS transactions, or otherwise limit the collateral calls; and (h) failure to measure and hedge against downgrades by credit agencies to Pfizer's credit and the impact this would have on collateral calls during the Class Period.

281.   Moreover, the Prudence Defendants, including Defendant Pfizer, knew or should have known of the facts causing an investment in Pfizer stock to be imprudent and would have learned such facts had they conducted an appropriate independent investigation.  Nevertheless, the Prudence Defendants failed to conduct an appropriate independent investigation.

282.   The Prudence Defendants' decisions respecting the Plans' investment in Pfizer stock, under the circumstances alleged herein, constituted an abuse of their discretion as ERISA fiduciaries because a prudent fiduciary acting under similar circumstances would have made different investment decisions.  Specifically, a prudent fiduciary could not reasonably have believed that further and continued investment of Plan assets in Pfizer stock was in keeping with the Plans' settlors' expectations of how a prudent fiduciary would operate.

283.   The Prudence Defendants were obligated to discharge their duties to the Plans with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of

an enterprise of a like character and with like aims.   ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

284.    According to DOL regulations and case law interpreting this statutory provision, a fiduciary's investment or investment course of action is prudent if (a) he has given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties; and (b) he has acted accordingly.

285.    Given the conduct of the Company as described above, the Prudence Defendants could not possibly have acted prudently when they continued to invest the Plans' assets in Pfizer stock.

286.    The Plans did not purport to require the Defendants to offer Pfizer stock as a Plan investment option or invest any Plan assets in Pfizer stock regardless of circumstances.   Even if the Plans had sought to require investment in Pfizer stock, Defendants, as ERISA fiduciaries, were duty-bound to adhere to this direction only insofar as it was consistent with ERISA. Because Pfizer stock was not a prudent investment during the Prudence Class Period, Defendants were required by ERISA to suspend investment in the stock and take appropriate action to protect the Plans.   Defendants failed to satisfy this fundamental ERISA obligation.

287.    As a consequence of the Prudence Defendants' breach of fiduciary duties alleged in this Count, the Plans suffered significant losses.   If the Prudence Defendants had discharged their fiduciary duties to prudently invest the Plans' assets, the losses suffered by the Plans would have been minimized or avoided.   Therefore, as a direct and proximate result of the breach of

fiduciary duties alleged herein, the Plans, and indirectly Plan participants and beneficiaries, lost over hundreds of millions of dollars of retirement savings.

288.    Defendant Pfizer profited from its breach of fiduciary duties because its failure to perform its duties resulted in a diminution of the contribution obligation it owed to the Plans regarding the Employer Matching Contribution.

289.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Prudence Defendants are liable to restore the losses to the Plans caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

### C.    Count III:  Breach Of Fiduciary Duty To Disclose Necessary Information To Co-Fiduciaries

290.    Plaintiffs incorporate by this reference the allegations above.

291.    This Count alleges fiduciary breach against Defendant Pfizer and the Director Defendants.

292.    Pursuant to the duties of prudence and loyalty which every ERISA fiduciary owes to the plans pursuant to ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), such fiduciaries are required to disclose to their co-fiduciaries information that they know is unavailable to their co-fiduciaries, but that such co-fiduciaries need to protect the interests of the plan.

293.    The following fiduciaries of the Plans possessed non-public information during the Class Period about the risks posed by Pfizer stock, which they knew could be used by other fiduciaries of the Plans (in particular the Pfizer Plan Committee Defendants with respect to each Plan) to protect the Plans and their participants and beneficiaries: (1) Defendant Pfizer, which was a *de jure* fiduciary to the Plans by dint of serving as statutory Plan Administrator, as the *de*

*facto* fiduciary that exercised authority and control over the conduct of the Pfizer Plan Committee Defendants; and (2) the Director Defendants (Sullivan, Willumstad, and Tse), who were fiduciaries of the Plans because of their authority to appoint and remove the Trustees of the Plans, and as d*e facto* fiduciaries as a result of their communications directed to Plan participants.

294.    As previously alleged, the Pfizer Plan Committee Defendants should have sought information concerning the risks posed by an investment in Company stock as part of a thorough and careful investigation of the merits of investment in Company stock during the Class Period, but failed to do so.  Nevertheless, those fiduciaries in possession of such knowledge, Pfizer and the Director Defendants, should have supplied that information to the Pfizer Plan Committee Defendants voluntarily in the fulfillment of the fiduciary duties they owed to the Plans.

295.    Defendant Pfizer and the Director Defendants profited from their breaches of this duty.

296.    As a consequence of Defendant Pfizer's and the Director Defendants' breach of fiduciary duty, the Plans suffered significant losses.  If Pfizer and the Director Defendants had discharged their fiduciary duty to disclose necessary information to co-fiduciaries as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breach of fiduciary duties alleged herein, the Plans, and indirectly Plan participants and beneficiaries, lost hundreds of millions of dollars in retirement savings.

297.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), Defendant Pfizer and the Director Defendants are liable to restore the losses to the Plans caused by their breach of fiduciary duties alleged in this Count, to disgorge any profits made through their breach and to provide other equitable relief as appropriate.

**D.      Count IV:  Failure To Monitor Fiduciaries**

298.    Plaintiffs incorporate by this reference the allegations above.

299.    This Count alleges fiduciary breach against Defendant Pfizer and the Director Defendants (collectively, the "Monitoring Defendants").

300.    As alleged above, during the Class Period the Monitoring Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence set forth in ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

301.    As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and thus, monitor the performance of other fiduciaries.

302.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries and the appointing fiduciaries whom they appoint are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants or for deciding whether to retain or remove them.

303.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession which they know or reasonably should know that the monitored fiduciaries must have to prudently manage the plan and the plan assets,

81

or which may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

304.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things: (a) failing, at least with respect to the Plans' investment in Company stock, to monitor their appointees, to evaluate their performance, or to have any system in place for doing so, and standing idly by as the Plans suffered enormous losses as a result of their appointees' imprudent actions and inaction with respect to Company stock; (b) failing to ensure that the monitored fiduciaries appreciated the true extent of Pfizer's highly risky and inappropriate business practices, and the likely impact of such practices on the value of the Plans' investment in Pfizer stock; (c) to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plans' assets; and (d) failing to remove appointees whose performance was inadequate in that they continued to make and maintain investments in Pfizer stock despite their knowledge of practices that rendered Pfizer stock an imprudent investment during the Class Period for participants' retirement savings in the Plans, and who breached their fiduciary duties under ERISA.

305.    As a consequence of the Monitoring Defendants' breach of fiduciary duties, the Plans suffered tremendous losses.  If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plans would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plan participants and beneficiaries, lost hundreds of millions of dollars in retirement savings.

306.    Defendant Pfizer profited from its breach of this duty because its failure to perform its duties resulted in a diminution of the contribution obligation it owed the Plans.

307.     Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plans caused by their breach of fiduciary duties alleged in this Count, to disgorge profits made and to provide other equitable relief as appropriate.

### E.     Count V:  Breach Of Fiduciary Duty—Failure To Provide Complete And Accurate Information To The Plans Participants And Beneficiaries

308.     Plaintiffs incorporate by this reference the allegations above.

309.     This Count alleges fiduciary breach against Defendant Pfizer, the Director Defendants, and the Pfizer Plan Committee Defendants (the "Communications Defendants").

310.     At all relevant times, as alleged above, the Communications Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

311.     At all relevant times, the scope of the fiduciary responsibility of Defendant Pfizer and the other Communications Defendants with respect to each Plan included the communications and material disclosures to the Plans' participants and beneficiaries.   In addition, the Director Defendants acted as *de facto* communicating fiduciaries as a result of their extensive communications directly with employees/Plan participants regarding the Company and its likely future prospects.  The Director Defendants knew that the employees' retirement savings were invested significantly in Pfizer stock in the Plans.   Thus, they knew that their communications concerned this investment (a Plan benefit), and that these constituted acts of Plan administration under ERISA.

312.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to participants, not to mislead them regarding the plan or plan assets, and to disclose information that participants need to exercise their rights and interests under the plan.  This duty to inform

participants includes an obligation to provide participants and beneficiaries with complete and accurate information, and to refrain from providing false information or concealing material information, regarding plan investment options so that participants can make informed decisions with regard to the prudence of investing in such options made available under the plan.  This duty applies to all of the Plans' investment options, including investment in Pfizer stock.

313.    Because investments in the Plans were not properly diversified (*i.e.* the Defendants chose to invest the Plans' assets, and/or allow those assets to be invested in Pfizer stock), such investment carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Pfizer stock.

314.    The Defendants breached their duty to inform participants by failing to provide complete and accurate information regarding Pfizer's serious mismanagement and improper business practices, public misrepresentations, and the consequential artificial inflation of the value of Pfizer stock, and, generally, by conveying incomplete information regarding the soundness of Pfizer stock and the prudence of investing and holding retirement contributions in Pfizer equity.  These failures were particularly devastating to the Plans and their participants because a heavy percentage of the Plans' assets were invested in Pfizer stock during the Class Period and, thus, losses in this investment had a significant impact on the value of participants' retirement assets.

315.    Defendants' omissions were material to participants' ability to exercise informed control over their Plan accounts because, in the absence of the information, participants did not know the true risks presented by the Plans' investment in Pfizer stock.  Since disclosures to the Plans' participants and beneficiaries of material information about Pfizer stock would have necessitated broader disclosures to the market under the securities laws, acquisition of shares by

the Plans during the Class Period would have occurred at a price more reflective of the information disclosed and the stock allocated to participants' accounts in the Plans would have been more fairly valued, resulting in a smaller reduction in Defendant Pfizer's obligation to the Plans.

316.    Defendants' omissions and incomplete statements alleged herein were Plan-wide and uniform in that Defendants failed to provide complete and accurate information to any of the Plans' participants.  Moreover, they were made in a fiduciary capacity.

317.    Defendant Pfizer profited as a result of the fiduciary breach described in this Count.

318.    As a consequence of the Communication Defendants' breach of fiduciary duties, the Plans suffered extensive losses.  If the Communication Defendants had discharged their duties to provide complete and accurate information to Plan participants as described above, the losses suffered by the Plans would have been minimized or avoided.  As a direct and proximate result of the breach of fiduciary duties alleged herein, the Plans, and indirectly Plans participants and beneficiaries, lost a significant portion of their retirement investment.

319.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plans caused by their breach of fiduciary duties alleged in this Count, and to disgorge any profits made through their breach.

### F.    Count VI: Breach Of Duty To Avoid Conflicts Of Interest

320.    Plaintiffs incorporate by this reference the allegations above.

321.    This Count alleges co-fiduciary liability against all Defendants.

322.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

323.     ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on a plan fiduciary a duty of loyalty that requires each fiduciary to discharge his/her duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and its beneficiaries.

324.     The fiduciary duty of loyalty entails, among other things, a duty to avoid conflicts of interest and to resolve conflicts promptly when they occur.  A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.  On information and belief, the compensation and tenure of the Prudence Defendants was tied to the performance of Pfizer stock and/or the publicly reported financial performance of Pfizer.  More specifically, as previously alleged, the Prudence Fiduciaries with respect to the Employer Matching Contributions were aware that the fair market value of the stock allocated to participants' accounts reduced the amount of the Company's contribution obligations, dollar for dollar.  Accordingly, to the extent that Pfizer stock was inflated by the existence of undisclosed material information that upon disclosure would cause the stock to be revalued downward, the Plans and their participants and beneficiaries were injured and the Company benefited.  Since the Prudence Defendants encompass the Company itself and certain of its officers and employees, these fiduciaries faced a stark conflict:  exposing the truth about the risks presented by Company stock would benefit the Plans at the expense of the Company.  Fiduciaries laboring under such conflicts, must, to comply with the duty of loyalty, make special efforts to assure that their decision making process is untainted by the conflict and made in a disinterested fashion, typically by seeking independent financial and legal advice obtained only on behalf of the plan.

325.     Defendants breached their duty to avoid conflicts of interest and to resolve them promptly by, *inter alia*: failing to engage independent fiduciaries who could make independent

judgments concerning the Plans' investment in the Pfizer Stock Fund; failing to notify appropriate federal agencies, including the United States Department of Labor, of the facts and transactions which made Pfizer Stock an unsuitable investment for the Plans; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; with respect to each of these above failures, doing so to prevent drawing attention to the Company's inappropriate practices; and by otherwise placing the interests of the Company, their co-defendants, and themselves above the interests of the participants with respect to the Plans' investment in Company Stock.

326.    As a consequence of all Defendants' breach of fiduciary duties, the Plans suffered losses.  If defendants had discharged their duties as described above, the losses suffered by the Plans would have been minimized or avoided.  As a direct and proximate result of the breach of fiduciary duties alleged herein, the Plans, and indirectly Plan participants and beneficiaries, lost a significant portion of their retirement investments.

327.    Defendant Pfizer profited from its breach of this duty because its failure to perform its duty resulted in a diminution of the contribution obligation it owed to the Plans regarding the Employer Matching Contribution.

328.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), all Defendants are liable to restore losses to the Plans caused by their breach of fiduciary duties alleged in this Count.

### G.    Count VII:  Co-Fiduciary Liability

329.    Plaintiffs incorporate by this reference the allegations above.

330.    This Count alleges co-fiduciary liability against all Defendants (the "Co-Fiduciary Defendants").

331.    As alleged above, during the Class Period the Co-Fiduciary Defendants were named fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1), or *de facto* fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), or both.  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

332.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if he knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach.  The Co-Fiduciary Defendants breached all three provisions.

333.    **Knowledge of a Breach and Failure to Remedy.**  ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.  As detailed below, each Defendant knew of certain breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

334.    The Pfizer Plan Committee Defendants were aware of each other's failure to conduct an independent investigation of the merits of the Plans' investments in Company stock. These Defendants were likewise aware of Defendant Pfizer's direction of their activities which resulted in the breach of their own duties, and, at various times in the Class Period, the Company's failure to provide them with information they needed to perform their duties as it related to the Plans' investment in Company stock.

335.    The Director Defendants were aware of the failure of the Pfizer Plan Committee Defendants to conduct an independent investigation of the merits of the Plans' investments in Company stock.

336.    Defendant Pfizer was aware of the breaches of each of the other fiduciaries.

337.    Because Defendants knew of the breaches of other Defendants detailed above, yet failed to undertake any effort to remedy these breaches, they are each liable for those breaches.

338.    **Knowing Participation in a Breach**.   ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary duty of another fiduciary with respect to the same plan if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Defendant Pfizer knowingly participated in the fiduciary breaches of the other Defendants in that it exercised control over their conduct and benefited from the diminution in the contribution obligation to the Plans that resulted from the failure to disclose information which would have resulted in a more proper valuation of the stock allocated to the participants' accounts.

339.    **Enabling a Breach**.   ERISA § 405(a)(2), 29 U.S.C. § 1105(2), imposes liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which gives rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

340.    Pfizer and the Director Defendants, by committing the breaches described previously, enabled the breaches of the Pfizer Plan Committee Defendants.

341.    As a consequence of the Co-Fiduciary Defendants' breach of fiduciary duties, the Plans suffered excessive losses.  If the Co-Fiduciary Defendants had discharged their duties as described above, the losses suffered by the Plans would have been minimized or avoided.  As a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly the Plan participants and beneficiaries, lost hundreds of millions of dollars in retirement savings.

342.    Defendant Pfizer profited from its breach of fiduciary duty because its failure to perform its duty resulted in a diminution of contribution it owed to the Plans regarding Employer Matching Contribution.

343.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (a)(3), the Co-Fiduciary Defendants are liable to restore the losses to the Plans caused by their breach of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## VIII.    CAUSATION

344.    The Plans suffered hundreds of millions of dollars in losses because substantial assets of the Plans were imprudently invested or allowed to be and remain invested by Defendants in Pfizer stock during the Class Period, in breach of Defendants' fiduciary duties.

345.    Had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, eliminating Pfizer stock as an investment alternative when it became imprudent, limiting its availability for investment and/or new investment, divesting the Plans of Pfizer stock when maintaining such an investment became imprudent, and causing the disclosure of complete and accurate material information about Pfizer stock to co-fiduciaries and to participants and beneficiaries, the Plans would have avoided some or all of the losses that they and, indirectly, the participants and beneficiaries suffered.

## IX.    REMEDY FOR BREACHES OF FIDUCIARY DUTY

346.    The Defendants breached their fiduciary duties because they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plans' assets should not have been invested in Pfizer stock during the Class Period.

347.    As a consequence of the Defendants' breaches, the Plans suffered significant losses.

348.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . .  who breaches any of the . . . duties imposed upon fiduciaries…to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ." and the disgorgement of profits made from a breach.  Here, in addition to causing losses, Defendant Pfizer profited from its breach and the breaches of its co-fiduciaries by allowing stock to be allocated to participants' accounts at prices inflated by the failure to disclose material information, resulting in the reduction of its contribution obligation.  These profits must be disgorged to the Plans.

349.    With respect to calculation of the losses to the Plans, breach of fiduciary duties result in a presumption that, but for the breach of fiduciary duties, the Plans would not have made or maintained their investments in the challenged investment and, instead, prudent fiduciaries would have invested the Plans' assets in the most profitable alternative investment available to them.  Alternatively, losses may be measured not only with reference to the decline in stock price relative to alternative investments, but also by calculating the additional shares of Pfizer stock the Plans would have acquired had the Plans' fiduciaries taken appropriate steps to protect the Plans.  The Court should adopt the measure of loss most advantageous to the Plans. In this way, the remedy restores the Plans' lost value and puts the participants in the position they would have been in if the Plans had been administered properly.

350.    Plaintiffs and the Class are therefore entitled to relief from the Defendants in the form of:  (a) a monetary payment to the Plans to make good to the Plans for the losses to the

Plans resulting from the breach of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. 1132(a)(3), for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

351.    Under ERISA, each Defendant is jointly and severally liable for the losses suffered by the Plans in this case.

## X.    CLASS ACTION ALLEGATIONS

352.    **Class Definition**.  Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plaintiffs and the following class of persons similarly situated (the "Prudence Class"):

> All persons, other than Defendants, who were participants in or beneficiaries in the PSP Plan, PSIP Plan, or W-L Plan at any time between August 29, 2000 and December 9, 2009 and whose accounts included investments in Pfizer stock, and all persons, other than Defendants, who were participants in or beneficiaries in the Pharmacia Plan or Searle Plan at any time between August 29, 2000 and April 16, 2003 and whose accounts included investments in Pharmacia stock.

353.    **Prudence Class Period**.  The Prudence Class Period begins on August 29, 2000 and continues to December 9, 2009.  The fiduciaries of the Plans knew or should have known at least by August 29, 2000 that the Company's material weaknesses and financial mismanagement were so serious that Pfizer stock could no longer be offered as a prudent investment for

retirement Plans, and/or that corrective disclosures to participants and beneficiaries were required.

354.    **Over-Concentration Class Definition.**  Plaintiffs also bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(f) and (b)(3) on behalf of a class of Plaintiffs and other plan participants similarly situated:

> All persons other than Defendants, who were participants in or beneficiaries of, the PSP Plan, PSIP Plan, WLPR, Pharmacia PR Plan and Searle PR plan and where accounts held 30% or more of their assets in Pfizer common stock and/or more than 70% of their assets in common stock funds at any time between August 29, 2000 and present.

355.    **Over-Concentration Class Period.**  The Overconcentration Class Period begins on August 29, 2000 and continues to the present.

356.    **Numerosity.**  The members of the Classes are so numerous that joinder of all members is impracticable.  While the exact number of Classes members is unknown to the Plaintiffs at this time, and can only be ascertained through appropriate discovery, based on the Plans' Forms 5500, Plaintiffs believe there were hundreds of thousands or even millions of participants and beneficiaries in the Plans.

357.    **Commonality**.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Classes. Among the questions of law and fact common to the Classes are:

> a)   whether Defendants each owed a fiduciary duty to Plaintiffs and members of the Classes;
>
> b)   whether Defendants breached their fiduciary duties to Plaintiffs and members of the Classes by failing to act prudently and solely in the interests of the Plans' participants and beneficiaries;
>
> c)   whether Defendants breached their fiduciary duties to diversify plan assets;

> d) whether Defendants violated ERISA; and
>
> e) whether the Plans have suffered losses and, if so, what is the proper measure of damages.

358. **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Classes because: (a) to the extent Plaintiffs seek relief on behalf of the Plans pursuant to ERISA § 502(a)(2), their claim on behalf of the Plans are not only typical to, but identical to a claim under this section brought by any Class member; and (b) to the extent Plaintiffs seek relief under ERISA § 502(a)(3) on behalf of themselves for equitable relief, that relief would affect all Class members equally.

359. **Adequacy**. Plaintiffs will fairly and adequately protect the interests of the members of the Classes and have retained counsel competent and experienced in class action, complex, and ERISA litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

360. **Rule 23(b)(1)(B) Requirements**. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Classes would create a risk of adjudications with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

361. **Other Rule 23(b) Requirements**. Class action status is also warranted under the other subsections of Rule 23(b) because: (1) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (2) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (3) questions of law or fact common to members of the Class

predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.      A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.      A Declaration that the Defendants, and each of them, are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      An Order compelling the Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breach of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets, to restore to the Plans all profits the Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

D.      Imposition of a Constructive Trust on any amounts by which any Defendant profited at the expense of the Plans as the result of breach of fiduciary duties;

E.      An Order requiring Defendants to appoint one or more independent fiduciaries to participate in management of the Plans' investment in Pfizer stock;

F.      Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.      An Order awarding attorneys' fees pursuant to the common fund doctrine, 29 U.S.C. § 1132(g), and other applicable law; and

I.      An Order for equitable restitution and other appropriate equitable and injunctive relief against the Defendants.

Dated: January 23, 2012                          */s/ Jo-Ann Estades Boyer*

                                                 Jo-Ann Estades Boyer
                                                 LAW OFFICES OF JO-ANN ESTADES BOYER
                                                 Taft Street # 16
                                                 Apt. 2
                                                 San Juan, Puerto Rico 00911
                                                 (787) 579-0019

                                                 SQUITIERI & FEARON, LLP
                                                 Lee Squitieri
                                                 32 East 57th Street
                                                 12th Floor
                                                 New York, New York 10022
                                                 (212) 421-6492

                                                 SANTOLI LAW OFFICES
                                                 Joseph Santoli
                                                 340 Devon Court
                                                 Ridgewood, New Jersey 07450
                                                 (201) 926-9200